## Case No. 15,314.

### UNITED STATES v. HARRIS.

[12 Blatchf. 434.] [1]

Circuit Court. S. D. New York. Jan., 1875.

CRIMINAL LAW — EVIDENCE — PROOF OF OTHER CRIMES—SMUGGLING.

On the trial of an indictment for smuggling, an officer of the customs, having given evidence for the defendant, the court refused to allow the counsel for the United States to interrogate him as to violations of the revenue laws committed by him, but in no way connected with the charge under consideration, for the purpose of discrediting him as a witness.

This was an indictment [against David P. Harris] for smuggling.

Ambrose H. Purdy, Asst. Dist. Atty.
Samuel G. Courtney, for defendant.

---

## Case No. 15,315.

### UNITED STATES v. HARRIS.

[1 Sumn. 21.] [2]

Circuit Court. D. Massachusetts. Oct. Term, 1830.

EMINENT DOMAIN—STREETS AND HIGHWAYS—EASEMENTS—OWNERSHIP OF FEE.

1. Where the legislature by a special act authorizes a street or highway to be laid out, and bars any action for possession or damages after

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Reported by Charles Sumner, Esq.]

the laying out. and provides for the damages in a special manner. the owner is still entitled to the fee, subject to the easement.

[Cited in Prather v. Western U. Tel. Co., 89 Ind. 525; Winter v. Peterson, 24 N. J. Law, 527; Water Works Co. v. Burkhart, 41 Ind. 371.]

2. Such special acts are to be construed in conformity to the general highway acts, unless the legislature use words. which show, that the fee of the lands taken is intended to pass from the owner.

[Cited in Dingley v. Boston. 100 Mass. 559; Malone v. Toledo, 34 Ohio St. 546.]

3. The laying out of a highway at the common law and under the highway acts of Massachusetts does not deprive the owner of the fee. but only subjects it to the easement.

[Cited in Boston v. Richardson, 13 Allen, 159. Cited in brief in Old Colony & F. R. Co. v. Plymouth. 14 Gray, 158.]

This was an action of trespass brought by the United States [against Richard D. Harris] to determine the title to a piece of land situated within the limits of the navy yard at Charlestown in Massachusetts. The principal facts. as agreed upon by the parties. were as follows:

In October, 1781, the legislature of Massachusetts passed an act, entitled an act for widening and amending the streets, lanes, and squares, in that part of the town of Charlestown, which was lately laid waste by fire. The act, after reciting. that a committee was appointed by the town for regulating the streets, lanes, and squares in that part of the town, which was so laid waste, and that the committee had accordingly proceeded to lay out the same. a plan of which had been laid before the court and was then deposited in the secretary's office, proceeded to enact, "that the proceedings of the committee be and they are hereby confirmed; and all actions, that shall be brought for recovering possession of any land lying within any of the streets, lanes. squares, &c., laid out as aforesaid, or for damages sustained or occasioned thereby. shall be utterly and for ever barred." It further enacted. that no buildings whatsoever be so erected as to encroach upon any street, lane, or square, by them so laid out as aforesaid; and reciting. that some persons may suffer damage by laying out the streets. &c. according to the plan aforesaid, and others may receive benefit and advantage thereby. provided. that the value of all lands and buildings and other materials, taken from any person by virtue of the act. should be ascertained by appraisers chosen in the manner pointed out by the act, and that the town should be held and obliged to pay to the person interested in the land, buildings, and materials aforesaid. the sum at which it may be appraised. In like manner persons benefited by the proceedings were to be assessed a proportionate sum, which their estates were subjected to pay. It does not appear who, at this time. were the owners of the land now in controversy before this court. upon the special case agreed

by the parties. But John Harris, the ancestor of the defendant, became owner thereof by deeds executed to him of various portions in 1791, 1792, and 1793, by various grantors. Although the plan of the committee was thus confirmed, no street was ever in fact laid out and opened over the premises until 1795 or 1796, when the town of Charlestown laid out a street over a part thereof, called Battery or Water street, for which a full compensation was paid to Harris by the town, by an award under the act of 1781. And again in 1798 or 1799. another street was laid out by the town, over another part thereof, called Henley or Meeting-House street, for which the town also paid a full compensation to Harris. Both streets were however marked out in the plan, and were finally laid out and opened. in conformity thereto. In this posture of affairs, the legislature of Massachusetts in June. 1800, passed an act (Act June 17, 1800; 2 Laws Mass. [1807] p. 940) consenting to the purchase by the United States of a tract of land in Charlestown for a navy yard, and ceding jurisdiction of the tract. not exceeding sixty-five acres. By that act. the value of the land so taken, when not agreed by the parties, was to be ascertained by a jury in the manner prescribed by the act. And accordingly the value of the land of Harris included in the navy yard was, upon the petition of Aaron Putnam, agent of the United States, so ascertained, and the amount paid to Harris by the United States in November. 1800, and February. 1804. In the proceedings under this inquest, five different parcels of land of Harris were set forth by abuttals as taken by the United States. and separately valued. One of these (No. 1) was on the north side of Henley or Meeting-House street, abutting thereon; another (No. 2) on the south side of the same street, and abutting thereon. and also on Battery or Water street; the other three (Nos. 3, 4. and 5) were on the south side of Battery or Water street and abutting thereon. Nothing material occurs in the description of either lot, except that in No. 2 the description begins as follows: "One other lot of land with the appurtenances. containing one half of an acre. &c." There were at that time three wooden buildings on No. 2, and no buildings on either of the other lots. In January. 1801. the town of Charlestown. for the accommodation of the navy yard. by vote declared. that such parts of the following streets and passages belonging to the town. as are included in the limits of the navy and dock yard be granted for the sole use of the United States; and that their termination from Main street be as follows, &c., describing certain lines across Henley or Meeting-House street. and across Battery or Water street. Harris being present at this town meeting. protested against the grant "on account of his rights to the advantages of the said streets." The premises in controversy constitute the land of the said street

so discontinued, and granted to the United States. The defendant claims the premises under Harris by devise and heirship. Upon these facts (which are the most material to be stated) the question arose, whether the United States had acquired any title to the premises in controversy, which are now included within the sixty-five acres and visible bounds of the Navy Yard.

Mr. Dunlap, U. S. Dist. Atty.

It is contended that Putnam's petition shows what land was wanted, and taken for the use of the United States, that is, John Harris' "lots," over which the roads had been laid out, which covered the places demanded on the part of the heirs of John Harris. This petition is broad enough to embrace the freehold of the roads, as was manifestly intended, being parts of those "lots." The jury were merely to value, not to bound the tract taken by the United States. Act Mass. June 17, 1800, § 2. Where it is not known to whom the fee of the road belongs, it is presumed to belong to the owners of the adjoining lots ex utraque parte, obviously upon the ground, that the road was taken out of what was once one lot, and belonging to the present or former owners of the adjoining tracts. In this case, the road, or the fee in the road, would have belonged to John Harris, as an abutter on both sides; for it would have been presumed to have been his property. The United States, taking his parcels bounded on the road, would have succeeded to his rights upon the presumption, that the fee of the road belonged to him. Can they lose their rights to the fee of the road, when, instead of being presumed, it is proved to have belonged to him, when the United States took the adjoining parcels ex utraque parte? Com. Dig. "Chimin"; 1 Rolle, Abr. 392, pl. 13; 1 Brownl. & G. 42; Lofft, 359; 13 Mass. 259; 3 Kent, Comm. 349; 1 Conn. 103; Just. Inst. lib. 2, tit. 1, § 25.

Under the term "appurtenances" in the valuation of one of the parcels bounded on both the roads, the fee of which is in controversy, the reversion of these roads passed. This was a summary proceeding, and not to be viewed with the strictness with which courts, from the force of precedents, established in the days of astute legal refinements, are accustomed to construe common law conveyances, oftentimes following precedents, which in these times would not be established. The appurtenances do not mean the buildings, for buildings pass with the land. "Cujus est solum, ejus est usque ad coelum." When buildings are referred to by those, who doubt, whether they pass with the land, or ex majori cautelâ, they are always distinctly mentioned. By appurtenances is meant, not what is on, but that which is off the land, the adjunctum of the civil law; and we say appurtenant to, but never appurtenant on. The difficulty about land not being appurtenant to land is not insuperable, and in this case presses with less force, because it is a sort of reversion, after the discontinuance of the road, which passes, and which, according to the doctrine in Shep. Touch. 89, may well pass as appurtenant to a possession. No one can suppose, that it was the intention of the parties to leave these slips of land in the navy yard, to be, thirty years after, the subject of contention and annoyance; and if the proceedings have been such as to produce this state of things, it is manifestly from a blunder, and not from design. The claim therefore rests on technicalities; and, it is believed, there is more of technicality to rebut than support it. The following authorities were quoted and commented upon: Co. Litt. 121, 122 (Hargrave & B. Note, 174); Co. Litt. 5b, 56a, 56b; Cro. Jac. 121, 526; Cro. Car. 17; Cro. Eliz. 16, 113, 114, 704, 89; Plow. 170B; 1 Lev. 131; Shep. Touch. 90; 2 Term R. 498, 502; 1 Bos. & P. 53; 2 W. Bl. 727; 2 Saund. 400; Hazard v. Robinson [Case No. 6,281]; Whitney v. Olney [Id. 17,-595]; 17 Mass. 447, 448; 8 Johns. 49; 6 Mass. 332.

John Harris' protest against the vote of the town of Charlestown passing the streets to the United States, was merely as an inhabitant of the town, to preserve the road, on account of his interest "in the road"; and it shows clearly that he considered his fee of the road taken; else he would not have protested against an act, the legal effect of which is, upon the ground now taken by his heirs, to revest in him the whole road and fee. The fact respecting the land purchased subsequently of Commodore Hull, it is contended, has no bearing upon the construction of Putnam's petition, and the verdict of the jury. The jury found one lot of John Harris in two parcels, each bounded on Henley or Meeting-House street, and they made a valuation of the whole lot by parcels from some imagined convenience. Still it is as much one lot, as a field through which a foot or cart way is granted, and as one lot completely covered by Putnam's petition. If, by the statute, the United States were authorized to take what might be wanted for the navy yard, not exceeding sixty-five acres, lying between Mystic and Charles rivers, against the will of the owners, which is believed to be the true construction of the statute, then all described in Putnam's petition, that is, John Harris' "lots," which include the roads, pass as levied upon by the United States. On the other hand, if the United States were not authorized to take the property against the will of the owners, then John Harris' receipt of the purchase money must be considered as an assent to the conveyance, and Putnam's petition is in the nature of a grant from Harris. In either case the result will be the same, and the roads be found included in John Harris' "lots," whether taken from him with or without his consent. These streets, the fee

of which, upon their being discontinued, is now claimed by the heirs of John Harris, were laid out by a committee of the town of Charlestown after the burning of that town by the British on the 17th of June, 1775, according to the plan in the office of the secretary of the state of Massachusetts. By the Massachusetts statute of October 30, 1781, the proceedings of the committee were confirmed; and by the first section it is provided, that "all actions that shall be brought for recovering possession of any land lying within any of the streets, lanes, squares, &c. laid out as aforesaid, or for damages sustained or occasioned thereby, shall be utterly and for ever barred." The language of this statute is as strong as possible: "all actions for the possession of any land lying within any of the streets, &c., are to be utterly and for ever barred." This statute, it is contended, destroys, in relation to the lands covered by these streets, the common law principle, that the ownership of the fee reverts to the original owners of the soil upon the discontinuance of the road; and the common law always gives way to the statute. 1 Bl. Comm. 89. In large cities and towns, the public necessity or convenience may require, that something more should be taken for streets, than the mere easements of a right of passing, which will answer for common highways. The freehold or fee may be required, and therefore may be taken. By this statute also all claims were "utterly and for ever barred," not only for the land lying within the streets, but also that lying within the "squares" laid out by the Charlestown committee. For the "squares" the freehold would be wanted, and the words of the statute as well bar all claims for the land lying within the "streets," as those within the "squares."

Mr. Minot, for defendants.

First. That the soil and freehold of the street called Henley or Meeting-House street, and of the street called Battery or Water street, did not pass to the United States, under and by virtue of the term appurtenances used by the jury in their verdict in the description of the lot No. 2, or by the description in said verdict of lots No. 1 and No. 3, or by the proceedings, by which the land was taken by the United States. By the second section of the Massachusetts statute of June 17, 1800, authorizing the purchase of the navy yard, it is provided, that if the agent of the United States and the owner of the land cannot agree in the sale and purchase, the land may be taken by the United States and valued by a jury. John Harris did not agree to the sale, and the land was taken under the statute by the agent of the United States. The transfer was therefore in invitum, and Harris cannot be considered as having made a voluntary conveyance of it. Before Meeting-House and Water streets were laid out, said

Harris owned all the land from the lane leading to the brick yards to low-water mark. In 1800 these streets had been laid out, and the jury valued the land in distinct parcels. The verdict finds, that the jury were shown several lots of land, and that they had set out these lots by metes and bounds. If the United States meant to take the whole land of said Harris, including what was covered by streets, it is not easy to conjecture, why the jury should have valued it in separate lots: no advantage could result to either party from this valuation. The statute does not require, that the land should be set out by metes and bounds; and all that could have been necessary was to describe the land with reasonable certainty, so that it should appear, that it was within the limits allowed for the purchase. But, in fact, the jury did not take the whole of Mr. Harris's land; they left a small gore adjoining the lot No. 2, which his administrators sold to Commodore Hull, and which he sold to the United States; and that gore is now within the precincts of the navy yard.

It is inferred, that the jury did not intend to include, and did not in fact include, the soil and freehold of the streets as parts of the land taken and valued by them, from the following facts and reasons: (1) The jury describe the several lots, as they were enclosed by fences running completely round them, and, where they were bounded by streets, describing them as running on or by the streets, and thereby excluding the streets. In fact, a map of the lots could not afford a more perfect or definite description, than the jury give. The only doubt, which has been suggested, whether the streets are excluded, arises from the use of the word appurtenances in the description of the second lot. It was argued in the court below, that if the term "appurtenances" carried the two streets on which the second lot was bounded, it would give all the streets of which said Harris owned the soil: but this is an error in fact. Water or Battery street extends from the east end of lot No. 2, to a point marked B, on the southeast corner of lot No. 1, a distance of more than 300 feet; and, for that distance, it cannot be pretended, that the soil of the street can be affected by any construction of the term "appurtenances," as used in the description of lot No. 2. (2) It appears from the statement of facts, that there were buildings on lot No. 2, and no buildings on the other lots. This was probably the reason, why the jury distinguished this lot from the others. The term "appurtenances" is often used, in common parlance, to mean buildings. There was something on this lot, which gave it an additional value above the others. Persons unskilled in conveyancing are apt to consider some notice of buildings as proper in a deed of land. It is apparent, that there is no technical nicety in any part of the proceedings. The United States agent, Mr. Putnam, was

not a lawyer; and it would appear from his petition, as well as from other parts of the proceedings, that he did not employ counsel. (3) If the jury intended to include the streets, under the term "appurtenances," in the second lot, why did they not use the same term in describing the other lots? Lot No. 1 is wholly surrounded by streets; and it is reasonable to suppose, that if they intended to give the streets, they would have done it most especially in describing No. 1. These streets were as important to the navy yard as those adjoining the other lots. (4) There is no award of the value of the streets in the verdict. As said Harris did not make a voluntary sale, the jury were bound to value all they took from him. (5) On the north side of lot No. 1 is the road leading to the brick yards (which is one of the roads discontinued by the town.) This road, or a part of it, was sold by the town to Aaron Putnam, by deed, dated March 25, 1801, in consideration of said Putnam's agreeing to make a new road, north of the old road. The road thus conveyed by the town to said Putnam, he conveyed (with other land) to the United States, on the 2d of April, 1801. From these transactions, it is inferred, that Putnam, the agent of the United States, did not consider the soil of the streets as taken by the jury. (6) When the United States took the land from said Harris, the streets were public highways, and the soil was of little value to said Harris to sell, incumbered as it was with the easement; nor could he make any valuable use of it, until the easement was discontinued. (7) The protest of said Harris, made in public town meeting, is evidence, that he did not believe the soil of the streets had been set off by the jury, and that he considered himself as possessing an interest of some value in the streets. Jackson v. Hathaway, 15 Johns. 447. Where a person, over whose land a highway is laid, sells the land on each side of the highway, by such a description as does not include the road or any part of it, the soil of the highway does not pass to the grantee; as it is excluded by the description of the land granted, and cannot pass as an incident, though the deed contain the usual sweeping clause of all right, title, interest, &c. In Tyler v. Hammond. 11 Pick. 193, the defendant held a lot of land, granted with an exact description of all the boundary lines. The deed contained a sweeping clause, under which the defendant claimed the soil in the adjoining highway; but the court held, that the particular description controlled the sweeping clause in the deed, and that the highway did not pass as an incident or appurtenant.

Secondly. That the limitation contained in said statute of October 30. 1781. was not a bar to the defendant's right to the soil and freehold of said streets. From the whole of the statute, it is obvious, that the legislature intended to conform the acts of the committee, as nearly as their doings would permit, to regular proceedings under the existing statutes relating to highways, and also to provide an equitable contribution from estates not taken for highways, on account of the advantage derived to such estates by laying out streets in their vicinity. It appears from the preamble, that the town of Charlestown was desolated and destroyed by the events of the war. An effort was made in 1780 to recover it, to restore order and regularity to the streets, and to enable its inhabitants to rebuild their houses on a uniform plan. The preamble states, that a committee was appointed by the town "for regulating the streets, lanes, and squares, in that part of the town, which was so laid waste, and the committee has accordingly proceeded to lay out the same." The committee, being appointed by the town, had no power under the existing laws to lay out streets; that power being vested in the selectmen personally, or "such persons as they shall appoint," and subject to the ratification of the inhabitants in town-meeting. But the committee of the town had no power to regulate the streets. Their object was to ascertain the lines of the streets (in that part of the town, which had been laid waste), which were obliterated by the destruction of buildings, &c. In doing this, the committee were liable to error by including within the lines of streets, lands not before included. The business of the committee was to regulate (which in this connexion must mean to restore to order and the former condition) the streets, and the "committee accordingly proceeded to lay out the same." Here is no suggestion that any act had been done, affecting the right to the soil, but only that the streets had been regulated, and laid out; proceedings, which do not necessarily or usually touch the freehold. It is presumed that the town discovered that the committee had transcended their powers, and it became necessary to apply to the legislature to confirm their doings. What the proceedings of the committee were, appears from the preamble. They had regulated and laid out highways. If their proceedings had been regular, no confirmation was necessary. Wherein were they irregular? The committee was irregular in its creation. A committee so appointed having no power by law to lay out highways, all its acts were void. It is gratuitous to suppose that the irregularity was in taking the soil for highways, since we prove an actual irregularity, which could be cured by the power of the legislature only. It was no advantage to the town to have the fee of the highways, nor is it to be presumed that the legislature would give to Charlestown more than it gave to any other town in the commonwealth. The first section of the act confirms the proceedings of the committee, and bars actions for possession or damages. This section places the owner of the land in the same situation, as he stood by the existing highway statutes, except that he cannot question the regularity of the taking by the committee, as he might an irregular taking under the high-

way statutes. When land is regularly taken for a highway, no action for possession or for damages can be maintained by the owner. His only remedy is by petition, &c. St. Mass. 1786, c. 67. This statute was intended to make the proceedings of this committee equivalent to highway statute proceedings, and nothing more. The preamble to the fourth section, says, that, "whereas some persons may suffer damage by laying out the streets," &c. This is the language used in the highway statutes. "Damage by laying out," &c. is surely not descriptive of the loss of the freehold. It is used to express the value of the easement taken by the public.

The common law, which preserves the freehold of a road to the owner of the land, was early adopted in Massachusetts; and it is not easy to conjecture any reasons why the legislature should alter the law in this particular instance (and there is no similar instance since the settlement of the country), or why the town of Charlestown should desire to possess the freehold of the roads, when the easement was just as valuable to them. The town was at that time so poor as to command the charity of the general court; and can it be believed, that it would prefer to take the fee of the highways, and thereby incur a greater expense than if the easement only was taken? The public exigencies require that highways should be established, and they are provided to be laid out, and a reasonable compensation is provided by a series of statutes enacted very early after the settlement of the country, altered and continued to the present time. But it is only a public exigency which justifies the appropriation of the property of an individual to public uses. No such exigency existed in the case at bar. The appropriation of the freehold of a road to the public was wholly unnecessary and totally worthless. It is true that the statute provides a compensation in this case; but from the language used, "damages for taking," being the same as used in highway statutes it may be inferred, that the legislature intended damages for the easement only. It cannot be presumed, that the legislature intended unnecessarily to violate private property, or to depart from the usual course of legislation on similar subjects; and in the absence of any manifest intention in the statute itself, to take the freehold of the streets, as well as from the uselessness to the town of such a proceeding, it is manifest that the legislature have adhered to the usual course of legislation on the subject of highways, and have given to the town all that it was needful for it to possess, without unnecessarily violating the property of an individual. It may be said, that John Harris has given validity to an illegal act by accepting a compensation. The reply is, that he had a right to compensation for the easement; that what he received was accepted by him for the value of the easement; and this is apparent from his protest at the surrender of the streets to the

navy yard, "on account of his right to the advantages of the streets." But it is doubted whether the laying out of Water or Battery street and Meeting-House street is affected by the operation of this statute. The language of the statute is retrospective. It confirms the past proceedings of the committee. It speaks of lands taken away by the plan. The streets in question were laid out up to the present line of the navy yard in 1781, but were not carried into the land now occupied by the navy yard until 1796 and 1799, and the land now claimed by the heirs of John Harris was not taken from him till 1796 and 1799. The streets were not laid through the navy yard in 1781. There was no taking of Harris's land at that time, and there could be no damages before taking. The referees in 1796 speak of a street proposed to lead to the meeting-house, "but not yet opened." Can the statute of 1781, confirming past proceedings, bar an action for an act done in 1796? Harris had sustained no damage in 1781. Nothing was taken from him, he had the vesture and herbage and all other profits of the land till 1796. It will be seen, by reference to the statement of facts, that the town of Charlestown sold Back lane, one of the streets in the navy yard not laid out by the town's committee in 1781, and upon which that act could have no operation. From this fact it appears, that the town considered itself vested with the whole property in the streets by the mere act of laying them out, and did not consider that property as derived from the act of 1781.

Thirdly. That, upon the discontinuance of a highway by the public, in Massachusetts, the soil and freehold of such highway reverts to the owner of the land taken for such highway. It is the settled law of Massachusetts, that, by the location of a way over the land of any person, the public acquire an easement: but the soil and freehold remain in the owner although incumbered with a way, and if the way be discontinued, he shall hold the land free from the incumbrance. This position is fully sustained by the decisions of the supreme court of Massachusetts, in Com. v. Peters, 2 Mass. 127; Fairfield v. Williams, 4 Mass. 427; Perley v. Chandler, 6 Mass. 454; Alden v. Murdock, 13 Mass. 259; Stackpole v. Healy, 16 Mass. 33; Robbins v. Boran, 18 Mass. [1 Pick.] 122.

STORY, Circuit Justice. The general principle of the common law is, that the soil, over which a street or highway is laid out, still remains the property of the original owner, subject to the easement, and he may pass the title thereto, notwithstanding the incumbrance. This principle is not now contested; and the only question is, how far it applies to the actual circumstances of the present case.

First, it is said, that the land on both streets (No. 2 abutting on opposite sides on them) will pass under the inquest as "ap-

purtenances" of No. 2. It may be admitted, that land may pass as "appurtenances" to other land, if such be the clear intent of the parties, as gathered from the terms of the deed or other instrument of conveyance; for, in such a case, the law does not insist upon strict propriety in the use of language, but is content to expound the words of the parties, and give effect to the instrument, according to the real and unquestionable meaning of the parties. But, strictly speaking, in a legal sense, land can never be appurtenant to land. But a thing, to be appurtenant to another, must be of a different and congruous nature such as an easement or servitude, or some collateral incident belonging to and for the benefit of the land. In Co. Litt. 121b, it is said, that nothing can be appurtenant, unless the thing agree in quality and nature to the thing whereunto it is appurtenant; as a thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal. And there are many other authorities to the same effect in Com. Dig. "Appendant and Appurtenant," and "Grant," E, 9. In a case, therefore, where the words of a grant pass land "with its appurtenances," the law will, in the absence of any controlling words, deem the word appurtenances to be used in its technical sense; and that construction will not be displaced, until it is made manifest from other parts of the grant, that some other thing was actually intended by the parties. I say, until it is made manifest; by which I mean, clearly and definitely ascertained, that the word is used in another sense. I add also, from other parts of the same grant; for it is not open to parol evidence to explain or vary the legal sense. If there is nothing in rerum naturâ, upon which the word can operate, that does not entitle the court to desert the legal sense. It has been said by the counsel for the defendant, that there were buildings on No. 2, to which the word "appurtenances" is commonly applied. But such buildings are in no just sense "appurtenances"; but if annexed to the freehold, they are a parcel of the land, and pass as such by the deed. It is not, however, necessary to show, that there are things granted, to which the word applies. It is often thrown in by conveyancers without any actual knowledge of the premises, to avail, as far as it may avail, by way of cautionary enlargement of the principal grant, if there be any thing, on which it may operate. If there be in fact no appurtenances, then the word, like other expletives in a deed, is merely nugatory. The authorities cited at the bar upon this point are full to the purpose, and especially Leonard v. White, 7 Mass. 6, Jackson v. Hathaway, 15 Johns. 447, and the very late case of Tyler v. Hammond, 11 Pick. 193, in the supreme court of Massachusetts. See also Com. Dig. "Chimin"; 2 Saund. 400, and note; 6 Mass.

332. To which I would add Whitney v. Olney [Case No. 17,595].

Now, in the present inquest (sufficiently loose in all its proceedings, and inartificially conducted, considering the magnitude of the interests at stake), there is nothing, upon which the court can put its finger, that in any manner justifies it in supposing the jury intended by "appurtenances" any thing but what are such in the legal sense. They appraise "one other lot, No. 2, with the appurtenances," then describing it by metes and bounds. These metes and bounds do not include the streets, or either of them. The lot is bounded by the streets, not over them. All the other lots are bounded on one of these streets; and there is no mention of "appurtenances" in the description of either of them. Yet if the intention were to include the land belonging to the streets, it must have been equally direct in regard to all these lots, as in regard to No. 2. The truth is, that no particular stress was laid on the word "appurtenances." If the streets had been private ways, the right to use them would have been "appurtenances" in the strict sense. But, as highways, they were public easements. This distinction may not have been attended to by the parties; and therefore the word "appurtenances" may have been inserted from greater caution. But the omission of it, in regard to the other lots, rather leads to the conclusion, that it was a chance hit; without intention or object. At all events, the fact, that all the lots are bounded by abuttals, which exclude the streets, irresistibly shows, that the jury did not intend to include them. If they had so intended, some positive expression would have been found. It has been said, that the duty of the jury was, to value the land only, and not to describe its boundaries. If it were so, it is too late to correct the error. But I am of opinion, that it was their duty to describe the land taken by definite bounds, in order to show the extent of this acquisition of property by the United States, in a proceeding in invitum. The description should be as definite and clear, as in a common grant. The title of the United States might otherwise have been brought into jeopardy. How, indeed, could the jury value the land without ascertaining its extent? So far, then, as the title of the United States is sought to be maintained upon this inquest, it appears to me unsustainable.

A question of more difficulty arises upon the construction of the act of 1781: whether it was simply intended to authorize the creation of servitudes or easements in the lands, over which the committee had laid out streets, lanes, and squares, according to the plan confirmed by the legislature; or whether it was intended to vest in the town the title and freehold of the soil itself, over which these streets, lanes, and squares were so laid. In other words, whether the

·town was to acquire the whole property in the land taken for streets, lanes, and squares, paying damages to the full value; or was to acquire only a right of way, or public use, paying damages only for such right, and leaving the general ownership in the land, as it was before. It is unnecessary to consider, how far the legislature possessed a constitutional authority to take the lands for either purpose, depriving the owner of the right of a trial by jury to ascertain his damages; for Harris took no such exception, and received a compensation awarded according to the provisions of the act. But it is material to state, that by the terms of the act it is declared, that "all actions that shall be brought for recovering possession of any land lying within any of the streets, lanes, squares, &c. laid out as aforesaid, or for damages sustained or occasioned thereby, shall be utterly and for ever barred." In the ordinary mode provided by law for laying out town ways, streets, and highways under our general statutes, it is clear, that an easement only is created; and, subject to that, the general propriety remains in the owner of the soil at the time of laying it out. He may use it for any purposes, not inconsistent with the easement. He is entitled to any profits from the herbage on the way-side, and may maintain trespass for any wrong or dispossession by any intruder. The present act in terms bars for ever actions brought for possession of any such lands; and therefore, taken in its literal signification, it may seem intended to bar for ever all possessory rights and remedies. It is true, that it does not purport to transfer any right. But the question made is, whether it does not so by fair implication. Could the owner, after the act, enter into possession, and thus destroy the easement? Could he enter into possession and cultivate the soil, not obstructing the easement? The pressure of the cause appears to me mainly to rest on this point; for, if all the right of Harris, and of those under whom he claimed, to the soil, was intended to be extinguished or to be vested in the town, then the defendant is guilty of a trespass. If not, then the title belonged to Harris; and the grant of the town, except so far as it operated as an extinguishment or discontinuance of the street over the premises, was utterly void. It is plain, how the town understood the act. They acted upon it as transferring the title in the land to them; and they accordingly, by their vote in 1801, intended to grant it to the United States, so long as the navy yard should be continued in that place. This mistake, however, on the part of the town, if it be a mistake, cannot change the legal right of the parties; but the case must be decided wholly upon the terms and intent of the act of 1781.

After reflecting a good deal upon the subject, my mind has at last come to the conclusion, that the act of 1781 was not intended to pass the freehold in the lands, but to create only an easement, which might be, and probably then was, contemplated to be perpetual. I will shortly state the reasons, which have conducted me to this result. In the first place, every act of a special nature, in derogation of private rights, ought to be construed strictly. This principle of construction is founded in the common law. And in cases of this nature, it acquires additional force from the constitutional provision in the bill of rights of the constitution of Massachusetts, that, "whenever the public exigencies require, that the property of any individual shall be appropriated for public uses, he shall receive a reasonable compensation therefor." The right, therefore, to take private property for public uses is limited to cases of public exigency. If the legislature expressly, or by necessary implication, state the exigency to exist, and the extent to which the property is to be taken, that would in common cases be decisive. But if the words used be equivocal, and upon the act it stand indifferent, whether a right of way only, or a right of freehold be taken, the natural construction would be, that the legislature intended an easement only, as that would be co-extensive with the exigency of the public use. Now, it is perfectly obvious, from the preamble of the act of 1781, that the committee of the town were appointed to regulate the streets, lanes, and squares in that part of Charlestown, which was laid waste; and that they had "proceeded to lay out the same," that is, to lay out the streets, lanes, and squares. This power, thus given by the town, was an excess of municipal authority, and not within the purview of any of the general statutes for the opening or widening of streets and highways. It was, therefore, ipso facto void, unless it received the confirmation of the legislature by some new enactment. The act of 1781 gave such confirmation. But the confirmation was intended to go no farther than the original authority, given by the town, extended; or at least no farther than the acts of the committee under it had gone. There is not a word in the statute, which looks beyond the acts of the town and committee; or which purports to provide for more extensive operations. The power given by the town to the committee was, to regulate the streets, lanes, and squares, in the part of the town laid waste. It is not easy to give any very exact sense to the term "regulate" in this connexion. It ordinarily implies, not so much the establishment of a new thing, as the arrangement in proper order of such as already exist. It might have meant no more than to ascertain, and fix, the lines and limits of the existing streets, lanes, and squares. But a liberal interpretation might perhaps fairly include the power to widen, alter, and extend the streets, lanes, and squares in that part of the town, so as to provide for the public convenience,

and the mutual connexion of the whole. The committee appear to have acted upon this interpretation; and after such a lapse of time it would be too much to hold it unsound, or unjustifiable, especially when it has received a legislative sanction.·

Assuming then, that the power to regulate, included the power to lay out streets, does the latter naturally or necessarily include the power to take away the freehold trom the owner of the soil, or only to create an easement over it? In the construction of the ordinary statutes respecting highways, the power given to selectmen, and other public functionaries, "to lay out" streets and highways, has always been held. (as has been already stated,) not to take away the freehold, but to create an easement only. The extraordinary power given to the committee is only a substitution of them for the ordinary functionaries. The power is the same; but the persons, who are to exercise it, are different. In what manner does this change the nature or extent of the power itself? It is a great misfortune in this case, that we cannot find the original doings of the committee in the town records; nor the petition of the town, on which the act of 1781 was founded; nor indeed any other proceedings relative thereto. We are compelled to rely wholly on the preamble of the statute for every memorial of the acts of the town and the committee. Under such circumstances, it seems to me, that we are bound to construe the statute cypres, and to subject its terms to the same interpretation, as words of a similar import have in the ordinary highway laws. The legislature ought to be presumed to use the words in the common sense, and under the same limitations, which the common law implies. unless some other intention is clearly manifested. The prohibition to maintain any action for possession, or for damages, does not necessarily import such an intention. It is true, that in common cases of highways, the owner of the soil may maintain an action for possession, subject to the easement. The words of the act of 1781 seem to bar such an action. But their generality may well be limited to cases, where a possession is sought inconsistent with the easement. The same clause bars any action for damages. What damages? Clearly for laying out the streets, not for taking the fee of the lands. The fourth section of the act provides for the manner of ascertaining the damages; and, though it speaks of appraising the value of the lands and buildings taken under the act, yet the preamble to that section expressly shows, that it is the damages done "by laying out the streets." and not by transferring the fee to the town. For all the purposes of the act, the public use is just as complete and perfect by the establishment of the streets, as by a transfer of the fee. The latter was not necessary for any avowed purpose of the town, or of the committee, or of the legislature.

It has been urged, that the act of 1781 did not extend to the land in controversy; for Water or Battery street and Meeting-House street were not laid out over the premises until many years after the passage of it. If the plan and report of the committee did not in fact contain a laying out of these streets in a legal sense, (for the time of their being actually opened is quite a different consideration,) it is perfectly clear, that the act of 1781 does not apply to them; for it confirms past proceedings only in laying out, and does not purport to authorize future proceedings of a like nature. And here, again, we are in the dark; for the proceedings of the town, as to these streets in 1795 or 1796, and in 1798 and 1799, cannot be found; and we have no means of ascertaining their import or effect. The plan alone remains; and that certainly extends the lines of the streets, as they were subsequently opened. In my view of the case, the adoption of the plan by the legislature in 1781 must be deemed, in a legal sense, a laying out of streets at that time; and the subsequent proceedings of the town were not a new laying out. but merely an opening of the old streets in conformity to the plan. Upon this point the argument is not. therefore, sustained.

But, for the other reasons already stated. my judgment is, that the laying out of the streets over the premises in 1781 did not transfer the fee from the then owners of the land, but left it in them, subject to the easement. And, according to the agreement of the parties, the United States are to become. nonsuit.