## EELLS et al. v. ROSS.

### (Circuit Court of Appeals, Ninth Circuit. October 10, 1894.)

### No. 143.

INDIANS — PUYALLUP RESERVATION — ALLOTMENT OF LAND IN SEVERALTY — MAKING INDIANS CITIZENS—EFFECT.

A treaty with the Indians of the Puyallup reservation allotted the lands in severalty, and provided that the privilege of allotment could only be availed of by persons who would "locate on the same as a permanent home," and authorized the president to prescribe such rules as would insure to the family, in case of the death of its head, possession of such home; to issue a patent to such person or family; and to cancel it, if issued, if such person or family "rove from place to place," etc. Each patent issued prohibited alienation. Act Cong. Feb. 8, 1887 (24 Stat. c.

119), conferred citizenship on such Indians, and provided for leasing the lands on certain contingencies, under regulations of the secretary of the interior, and contemplated that agents shall be in charge of reservations; and the practice of the department was to maintain such agents. *Held*, that the allotment of such lands in severalty, and making the Indians citizens, did not revoke the reservation.

Appeal from the Circuit Court of the United States for the District of Washington, Northern Division.

Bill by Frank C. Ross against Edwin Eells, Indian agent, and others, officers of the United States army, for an injunction restraining defendants from interfering with the building of a railroad across lands within the Puyallup Indian reservation which have been allotted to Indians in severalty. From a judgment and decree for complainant, defendants appeal. Reversed.

For prior report, see 56 Fed. 855.

This is an appeal from a judgment and decree of the circuit court of the United States for the district of Washington, Northern division, granting a perpetual injunction against the defendants to prevent them from restraining plaintiffs from grading and building a railroad over certain lands claimed to be within the limits of the Puyallup Indian reservation, and allotted in severalty to certain Indians named in the bill.

The case is presented for our consideration upon the pleadings and an agreed statement of facts. The facts as agreed to are as follows:

(1) That John Cook and Susie Cook, who are named in the bill of complaint, and each of them, are of Indian birth, and were formerly of the Puyallup tribe of Indians, living in the Puyallup valley and neighborhood, which is now embraced within the boundaries of the state of Washington.

(2) That they are the same John Cook and Susie Cook named in a patent dated the 30th day of January, 1886, signed by Grover Cleveland, president of the United States, a copy of which patent, marked "Exhibit A," is attached to and made a part of this stipulation, and were, at and prior to the date of said patent, husband and wife.

(3) That under and by virtue of the sixth section of an act of congress entitled, "An act to provide for the allotment of lands in severalty to Indians of the various reservations and to extend equal protection of the laws of the United States and the territories over the Indians, and for other purposes," approved February 8, 1887, being chapter 119 of volume 24 of the Statutes at Large, the said John Cook and Susie Cook, his wife, were made citizens of the United States, and are now citizens thereof.

(4) That said John Cook and Susie Cook executed and delivered to the plaintiff, Frank C. Ross, prior to the filing of the complaint in this cause, an instrument in writing in words and figures following, to wit:

"Permission is hereby given to Frank C. Ross to go upon and occupy any portion of lot one in section 21, township 21 north, range east W. M., King county, state of Washington, with his tents, camps, etc., for the period of six months from the date hereof, in consideration of the sum of one dollar per month.

|  | his |
| "[Signed] | John X Cook. |
|  | mark. |
|  | her |
|  | "Susie X Cook. |
|  | mark. |

"Dated April 15, 1893.

"Witness:
    "P. C. Stanup.
    "A. Kautz."

(5) That at and prior to the filing of said complaint, and prior to the time it is therein averred that defendants ordered the plaintiff to vacate the prem-

ises described in said writing. and threatened to compel him so to do if he refused. the said plaintiff, under the permission therein contained. had gone upon said premises, and was occupying the same with tents, camps, etc., thereon.

(6) That on the 4th day of March, 1893, the plaintiff and the said John Cook and Susie Cook, his wife, entered into the written and printed contract, a copy whereof is hereunto attached, marked "Exhibit B," and made a part of this stipulation.

(7) That thereafter, and prior to the filing of the complaint in this action, and prior to the orders and threats made by the defendants as in the complaint stated, the plaintiff had, under claims of right so to do as granted in said contract, Exhibit B, gone upon said premises, and was by the aid of his engineers and divers laborers, the latter being of Indian birth, and former members of said Puyallup tribe, engaged in locating and clearing the right of way for a railroad upon, over, and across said premises.

(8) That on the 15th day of May, 1893, and prior to the hour at which the restraining order in this cause was granted, and prior to the filing of the complaint in said cause, the defendants Edwin Eells and G. A. Carpenter, with a force of armed men, went upon said premises described in the said contract for right of way, to wit. lot 1 in section 21, township 21 N., range 3 E. W. M., in King county, state of Washington, and by force and arms endeavored to compel the said laborers and engineers to quit said premises, and to desist from establishing and preparing said right of way for grading and the grade of said line of railroad.

(9) That the defendant Edwin Eells is an agent of the United States in charge of certain Indian reservations in the state of Washington; but whether he has any rights to act as such in reference to the Indians constituting what was formerly the Puyallup tribe is not conceded or denied by this stipulation, but is left to be decided by the court, upon the facts that may be proved in relation thereto, and the law applicable thereto, as the same shall be found by the court.

(10) That the other defendants are commissioned officers in the United States army, and the men who were under their control and constituted the force heretofore stated are noncommissioned officers and privates of the United States army, and all were acting under orders of the president of the United States.

(Section 11 erased.)

(12) That the said Indians, including the said John Cook, are assessed and taxed as other citizens of the state on all property owned by them, except their said lands, which as yet have never been assessed for taxation.

(13) By act of congress approved March 3, 1893, the congress has undertaken to provide a method for the sale of these lands.

William H. Brinker, for appellants.

F. Campbell, for appellee.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

McKENNA, Circuit Judge (after stating the facts as above). We do not consider it necessary to consider or decide all the propositions argued. If the land was an Indian reservation, the agents had a right to remove all persons found there contrary to law. Rev. St. § 2147. See, also, Rev. St. §§ 2118, 2149. It is not disputed that the lands are a part of those set apart as the Puyallup reservation, and that the reservation has not been directly revoked; but it is contended that the allotment of the lands in severalty, and afterwards making the Indians citizens, necessarily had the effect to revoke the reservation. There is plausibility in the argument, and it needs to be carefully considered. It is clear that the allotment alone could not have

this effect (The Kansas Indians, 5 Wall. 737), and citizenship can only have it if citizenship is inconsistent with the existence of a reservation. It is not necessarily so. Some of the restraints of a reservation may be inconsistent with the rights of citizens. The advantages of a reservation are not; and if, to secure the latter to the Indians, others not Indians are excluded, it is not clear what right they have to complain. The act of 1887, which confers citizenship, clearly does not emancipate the Indians from all control, or abolish the reservations. Section 3 provides for leasing lands under certain contingencies, under the regulations of the secretary of the interior, and the proviso of the section contemplates agents in charge of the reservations. Besides, the practice of the department has been and is to maintain them, and this practice is respectable evidence of a correct interpretation of the statute by officers who may have suggested the policy and written the provisions of the statute. Railroad Co. v. Whitney, 132 U. S. 357, 366, 10 Sup. Ct. 112; Sturr v. Beck, 133 U. S. 548, 10 Sup. Ct. 350. That the abolition of reservations and of the guardianship of the Indians is the ultimate hope of the policy, there can be no doubt; but it will not be soonest realized by attributing fanciful qualities to the Indians, or by supposing that their natures can be changed by legislative enactment. But the appellees claim contracts with the Indians, and a right to occupy the land, and the circuit court held that the government, by making the Indian proprietors citizens, lost the power "to coerce such Indians into making or annulling contracts, or of molesting persons upon their premises by their license, when not interfering with the operations of the government, or violating any national law." And the court further held that by the issuance of the patent "the government lost entirely the right to control the use of the land." The patent has clear words of prohibition against alienation, and, even if it had omitted them, the treaties and law imposed them. Taylor v. Brown (Dak.) 40 N. W. 527.

The power of the government to impose the restraints is not questioned, and its purpose is certainly not ambiguous. The treaties with the Indians; the allotment of the land in severalty,—all had their purpose of fixing them in permanent homes. By article 6 of the treaty, the privilege of allotment can only be availed of by those who will "locate on the same as a permanent home," and the purpose is so careful, insistent, and dominant that the president is given power to—

"Prescribe such rules and regulations as will insure to the family in the case of the death of the head thereof the possession and enjoyment of such permanent home and he may issue a patent only to such person or family who has made a location for a permanent home and if issued may cancel it if such person or family 'rove from place to place,' and the tract may be declared abandoned and thereafter assigned to some other person or family."

From its relations to the title, and from the terms of the treaty, we think the government had the power to make such conditions, and that they were not destroyed by making the Indians citizens. Such effect cannot be deduced from the act of 1887, for, if congress could do so, congress did explicitly clog the title with a condition of nonalienation for 25 years, and absolutely nullified all contracts made, touching the same, before the expiration of such time.

In Smythe v. Henry, 41 Fed. 705, a statute which granted land to the Cherokee chief Junaluska, with restraint upon its alienation, and also made him a citizen of the United States, was considered, and it was held that a restraint against alienation was not inconsistent with the grant of citizenship. The court said:

"It is insisted that the restriction imposed upon the rights of alienation by the second section of the act is inconsistent with the spirit and purpose of the first section, which conferred upon Junaluska all the rights, privileges, and immunities of citizenship. When a state conveys land as a bounty, it can impose any restriction deemed proper upon the grantee. When we consider the condition of that new citizen, we may well conclude that the restriction was not unreasonable, but was, rather, just, wise, and beneficent."

And it was held in Re Coombs, 127 Mass. 278, that it was competent for the legislature to continue the guardianship of Indians by the state after they had been made citizens.

It follows, therefore, that the contracts of complainant with the Indians were void, and that he was properly removed from the reservation. We have not distinguished between the lease and the contract to convey, as we deem them parts of one transaction. If it is for the interest of the Indians or of commerce to remove the restraints on alienation, congress will no doubt do so, if applied to, and in the latter case it will be enabled to provide for the interests of the Indians better than they have seemed to have provided for themselves in the contract with appellee. Judgment reversed, and cause remanded, with directions to dismiss the bill.