TUTTLE ET AL VS. MOORE ET AL.

Opinion delivered October 5, 1901.

*1.  Inndian Lands—Sale of by Townsite Commission—Injunction.*

In an action by plaintiff to enjoin the town-site commissioners from selling certain lots occupied and claimed by him, the Creek Nation was allowed to intervene and in its complaint alleged the threatened sale of all other lots in the town of Muskogee and asked that such sale be enjoined. *Held*, that the motion of defendants to strike out all allegations of the intervener relating to other lots than those in which plaintiff was interested, should have been sustained.

*2.  Creek Nation—Citizens—Relation to United States.*

The Creek Nation and other Indian tribes are dependents upon the government of the United States; and their citizens or members are wards of the government and under its protection.

*3.  Indian Citizens—Have no Vested Interest in Lands.*

Under the treaties with the Creek Nation, the lands of that Nation were conveyed to the Nation as a tribe and not to the individual members thereof, nor are they held in common; and an individual Indian has no vested interest in any specific tract.

*4.  Indian Lands—Townsites—Platting and Sale of—Curtis Bill, Constitutional—Treaties.*

Under Section 15 of the act of June 28, 1898, known as the "Curtis Bill" townsite commissioners are provided for who are expressly authorized to lay out townsites in the Creek Nation and sell the lots; and as such act has been held to be constitutional by the supreme court of the United States, their power to sell these lots is unquestioned. And even if such provision is in conflict with any treaty of the Creek Indians with the United States, it is established that any provision of a treaty may be superseded by a subsequent law.

*5.  Indian Lands—Power of United States as Guardian.*

> By reason of the relationship of the United States to the In-
> dians being that of guardian, Congress has ample power and
> authority to dispose of the Indian's lands if it sees fit to do so,
> acting for the best interests of the Indians.

*6.  Indian's Lands—Sale of—Eminent Domain.*

> Congress has power, under the law of eminent domain, to dis-
> pose of the Indian lands upon proper provision for compensa-
> tion to the owners thereof as required in the fifth article of
> the amendments to the U. S. Constitution.

*7.  Eminent Domain—Public Use—Legislative Determination Con-
   clusive.*

> Where a legislature has concluded that an exigency exists which
> calls upon it to exercise the power of eminent domain, that
> determination is conclusive; and courts cannot inquire into
> the necessity or propriety of the exercise of the right.

Appeal from the United States court for the Northern
district.   John R. Thomas, Judge.

Action by Napoleon B. Moore, plaintiff, and the Creek
Nation, intervener, against Dwight W. Tuttle and others.
Judgment in favor of plaintiff and intervener.   Defendants
appeal.   Reversed.   Clayton, J., dissenting.

The plaintiff below (appellee here), on the 25th day
of August, 1900, filed his complaint against the defendants
below (appellants here) in the Northern district, Ind. T.,
and alleged:   "That the defendants were appointed under
the provisions of the so-called 'Curtis Bill' as commission-
ers for the Muskogee town site, and are duly qualified and
acting as such, and that by virtue of their so-called 'office'
they have, pursuant to the provisions of said law, and the
rules and regulations of the secretary of the interior made
in pursuance thereof, caused to be surveyed into lots,
blocks, etc., the incorporated town of Muskogee, and have
appraised the lots and improvements situated thereon

throughout said town, all of which has received the approval of the secretary of the interior." That plaintiff is a Creek Indian by blood, and that pursuant to the laws and customs of the Creek Nation he owns and occupies, as against all persons whomsoever except the Creek Nation, certain lots in the town of Muskogee; and that defendants have served him with written notice and demand to pay 10 per cent. of one-half appraised value, or they will sell said property at public auction. "That the said members of the said town site commission are not bonded officers, and cannot be made to respond in damages for the trespass they are about to commit. That they threaten to commence the advertisement, and consequent sale, of this and all of his property in the town of Muskogee during the next week. That the said sale of his property aforesaid by said commission is without right, and without authority of law; and the result, if they are not enjoined by this court, will be an irreparable injury to this plaintiff, and be depriving him of his property, acquired rightfully and pursuant to law, without a shadow of right, and without due process of law. That the said commission have no interest in said property, and represent no one having an interest in the same, and that he is the indefeasible owner of the improvements upon said lot, and likewise of the possessory right to said lot against every person in the world except the Creek Nation, which has not given its consent to the threatened proceedings herein." Plaintiff prays for an injunction against defendants restraining them in their individual capacity, "as well as acting as the so-called 'Muskogee Town-Site Commission,'" from clouding the title or selling said property. On the same day motion for temporary injunction was made, and thereupon the Creek Nation, through P. Porter, as principal chief, presented a petition to intervene, and alleged that the lots mentioned were the property of the Creek Nation, and "that under the provisions of the law under which said sale will be made it is provided that, when final

payment is made, the purchasers will have complete evidence of the title to the property so purchased. That, if said action is not restrained, such proceedings will cause a multiplicity of suits on the part of the nation, and will be an irreparable injury to it. Second. He further avers that he is in receipt of a communication from the interior department of recent date. not only instructing said commissioners to sell all the lots within the incorporated town of Muskogee upon which improvements have been erected, and which are occupied by citizens and noncitizens, but also unimproved and vacant lots which are a part of the public domain;'' asks that the Creek Nation be made a party, that injunction be granted. And, ''third, that the order which may be made herein be sufficiently enlarged to restrain and prevent defendants from selling any other town lots or other real estate within the corporate limits of the town of Muskogee, or from advertising the same, or any of them, for sale, or otherwise interfering with the possession of or title to said lots or property.'' On the same day the court granted the petition of the Creek Nation to intervene, and a temporary injunction as prayed for. On September 28, 1900, defendants filed demurrer to complaint of plaintiff as follows: ''First, that this court has no jurisdiction of the subject-matter of said action; second, that said complaint does not state facts sufficient to constitute a cause of action against these defendants.'' On the same day defendants moved to strike out the second paragraph of complaint filed by the Creek Nation for the reason that it ''set up a different and distinct cause of action from that contained in the first paragraph of said complaint,'' and to strike out the third prayer of said complaint ''for the reason that said prayer relates to property not the subject-matter of the original action filed herein by Napoleon B. Moore, and for the further reason that said prayer relates entirely to property other than that included in said suit, and would constitute a misjoinder of causes of action, and for the further reason that the said

plaintiff, Napoleon B. Moore, has no claim or interest there-
in on account of which he could maintain any action, or ask
any equitable relief as party plaintiff.'' Subsequently said
demurrer to the complaint of Moore and motion to strike out
parts of the petition of the Creek Nation were overruled,
and defendants answered the complaint of Moore, denying
all his allegations, and alleged as follows: ''And these
defendants, further answering, aver that they are the legally
appointed, qualified, and acting members of the Muskogee
town-site commission, duly appointed, qualified, and acting
under and by virtue of the provisions of an act of congress
entitled 'An act for the protection of the people of the In-
dian Territory, and for other purposes,' approved June 28,
1898 (Ind. T. Ann. St. 1899, c. 3a), and further aver that they
are acting in strict accordance with the provisions of section
fifteen of said act." On October 1, 1900, defendants filed a
demurrer to the first cause of action stated in the petition of
the Creek Nation as follows: ''First, that this court has no
jurisdiction of the subject-matter set forth in said first para-
graph of said complaint; second, that said plaintiff has no
legal capacity to sue; third, that said alleged first cause of
action does not state facts sufficient to constitute any cause
of action against these defendants;'' and on same day filed
demurrer to second cause of action, as follows: ''First,
that this court has no jurisdiction of the subject-matter con-
tained in said second paragraph of said complaint; second,
that the said Creek Nation has no legal capacity to sue for
and on account of the matters set forth in said second cause
of action; third, that said alleged second cause of action does
not state facts sufficient to constitute any cause of action
against these defendants. " On the same day the court over-
ruled said demurrers, and defendants filed answer to petition
of the Creek Nation, denying all its allegations, and al-
leging as follows: ''And these defendants, further answer-
ing, aver that they are the legally appointed, qualified, and
acting members of the Muskogee town-site commission,

duly appointed, qualified, and acting under and by virtue of the provisions of section fifteen of an act of congress entitled 'An act for the protection of the people of Indian Territory, and for other purposes,' approved June 28, 1898; and further aver that they are acting in strict accordance with the provisions of said section and said act.'' On the 29th day of October, 1900, the evidence of N. B. Moore was filed, and by agreement ''all objections to said testimony for any matter of substance may be made to the court to the same effect as if the witness was testifying orally.'' On January 4, 1901, the case came on for final hearing before the court, and the temporary injunction was made perpetual. Defendants excepted, and appealed to this court.

*P. L. Soper*, U. S. Atty., and *J. H. Huckleberry, Jr.*, (*O. L. Rider*, of counsel), for appellants. *Hutchings & West*, for appellees.

TOWNSEND, J. The appellants have filed 14 specifications of error, but discuss the same under three heads, as follows: ''First, all that portion of the record which relates to lands or lots not described or embraced within the original petition of Napoleon B. Moore; second, rulings of the court upon evidence; and third, the constitutionality of section 15 of the Curtis act.''

Under the first head the appellants assign for error the refusal of the court to strike out on motion of appellants certain allegations in the petition of the Creek Nation relating to other property than that in which Moore, the original complainant, was interested, as shown by his complaint, for the reason that it was a misjoinder of causes of action. Under the law as it existed prior to the act of June 28, 1898 (Ind. T. Ann. St. 1899, c. 3a), an Indian tribe could not institute suit in the United States courts. Said courts had no jurisdiction of such suits. See Cherokee Nation vs Georgia, 5 Pet. 1, 8 L. Ed. 25; Crabtree vs Madden, 4 C. C. A.

408, 54 Fed. 426.    But the said act of June 28, 1898, contained this provision:  "Sec. 2.    That when in progress of any civil suit, either in law or equity, pending in the United States court in any district in said territory, it shall appear to the court that the property of any tribe is in any way affected by the issues being heard, said court is hereby authorized and required to make said tribe a party to said suit by service upon the chief or governor of the tribe, and the suit shall thereafter be conducted and determined as if said tribe had been an original party to said action."   It would seem that the tribe, under this provision, could be brought in when its property was affected by the issues being heard. Moore had no interest whatever except in three lots mentioned in his complaint, whereas the Creek Nation, coming in as an intervener, desired to litigate the question as affecting all the lots in Muskogee.    We think the court should have sustained the motion of defendants to strike out.    That this is the correct practice, see Gartland vs Dunn, 11 Ark. 720;  Terry vs Rosell, 32 Ark. 478;  Riley vs Norman, 39 Ark. 162;  Turner vs Alexander, 41 Ark. 254;  Organ vs Railroad Co., 51 Ark. 261, 11 S. W. 96.

    Under the second head appellants' counsel, in his brief, ably discusses the alleged errors of the court in sustaining the objections of appellees to the admissibility of certain testimony.    But, in our opinion, the more important, as well as the controlling, questions are raised under the assignments of error discussed under the third head, and the three following propositions are all that we deem it necessary to notice:  (1) What is the relation of the Creek Nation and its citizens to the United States?  (2) Has Moore, plaintiff, any vested interest in and to the lots in controversy?  (3) Has congress power to set aside lands of an Indian tribe for the purposes of a town site (a) under the doctrine of parens patriæ; (b) under the doctrine of eminent domain?

Under the first proposition it may be said that the Indian tribes have always been regarded as dependent upon the government of the United States and their citizens as wards of the government, and under its protection. See the following: In U. S. vs Kagama, 118 U. S. 383, 6 Sup. Ct. 1109, 30 L. Ed. 228, the court said: "These Indian tribes are wards of the nation. They are communities dependent on the United States. * * * From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen. * * * The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes." This view of their relationship is upheld in Stephens vs Cherokee Nation, 174, U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041. See, also, Cherokee Nation vs Georgia, 5 Pet. 1, 8 L. Ed. 25; Worcester vs Georgia, 5 Pet. 515, 536, 8 L. Ed. 483; Choctaw Nation vs U. S., 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 306; Beck vs Real Estate Co., 12 C. C. A. 495, 65 Fed. 35; U. S. vs Flournoy Live Stock & Real Estate Co. (C. C. ) 69 Fed. 891; U. S. vs Flournoy Live Stock & Real Estate Co. (C. C. ) 71 Fed. 577; U. S. vs Mullin (D. C. ) 71 Fed. 682; U. S. vs Boyd (C. C.) 68 Fed. 577; Eels vs Ross, 12 C. C. A. 205, 64 Fed. 417; In re Kansas Indians, 5 Wall 737, 18 L. Ed. 667.

Second. Has Moore any vested interest in these lots? The lands in the Creek Nation were conveyed to the nation

as a tribe, and not to the individual members thereof. See Revision of Indian Treaties, p. 103, art 3, "Patent." The lands in the Creek Nation are not held in common, because the title is vested in the nation as a tribe. The tribe itself cannot alienate the lands, and this limitation is valid. See Eels vs Ross, 12 C. C. A. 205, 64 Fed. 419; U. S. vs Flournoy Live Stock & Real Estate Co. (C. C.) 71 Fed. 577; In re Kansas Indians, 5 Wall, 737, 18 L. Ed. 667; U. S. vs Flournoy Live Stock & Real Estate Co. (C. C.) 69 Fed. 891; Smythe vs Henry (C. C.) 41 Fed. 705; Beck vs Real Estate Co. (C. C.) 71 Fed. 577. In Cherokee Nation vs Journeycake, 155 U. S. 207, 15 Sup. Ct. 55, 39 L. Ed. 120, the supreme court held: "Under these treaties, and in December, 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed was conveyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them." In Stephens vs Cherokee Nation, 144 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041, and Johnson vs Creek Nation, 174 U. S. 488, 19 Sup. Ct. 722, 43 L. Ed. 1041: The lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership." In Sanders vs Thornton, 38 C. C. A. 508, 97 Fed. 863, it is said: "The first assignment of error is that the court erred in refusing to charge the jury, at the request of the plaintiff, that, if the defendant is a citizen of the United States, he had no right to purchase or hold improvements on the public domain of the Cherokee Nation, and that plaintiff is entitled to a verdict. If the defendant was a citizen of the United States, and for that reason was not entitled to hold lands and improvements thereon in the Cherokee Nation, these facts alone would not entitle the plaintiff to recover, as the instruction asked broadly asserts. Several other things would have to occur to entitle the plaintiff to oust the defendant. These facts might entitle the sovereign to oust the defendant, but, if the defendant was not entitled to hold lands or improvements thereon in

the Cherokee nation, that is of no concern of the plaintiff, and he cannot profit by it in this action. The sovereign alone, either the United States or the Cherokee Nation, has the right to oust him of his possession or occupancy on that ground." It is clear that Moore has no vested interest in these lots.

Third. Has congress power to set aside lands of an Indian tribe for town-site purposes? Under section 15 of the act of June 28, 1898, the appellants are expressly authorized to exercise the power that the injunction in this case prohibits them from exercising. Can this injunction stand? It cannot be said that the act is unconstitutional, because the supreme court of the United States has settled that question in the case of Stephens vs Cherokee Nation, when they affirmed the judgments in the citizenship cases by declaring. "We hold the entire legislation constitutional." This is probably all that is necessary for the reversal of this case. But we infer from the able discussion made by appellants' counsel that the court was of the opinion that without a treaty giving the consent of the Creek tribe or nation congress had no power to enact this legislation. By article 10 of the treaty of 1866 it is provided: "Art. 10. The Creeks agree to such legislation as the congress and president of the United States may deem necessary for all better administration of justice and protection of all rights of person and property within the Indian Territory: provided, however, [that] such legislation shall not in any manner interfere with or annul their present tribal organizations, rights, laws, privileges and customs." If section 15 interferes with the proviso contained in this article, it is only necessary to state the established rule. That it has been frequently decided that any provision of treaty may be superseded by a subsequent law, see In re Cherokee Tobacco, 11 Wall, 616, 20 L. Ed. 227; In re Head Money Cases, 112

(47

U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798; Fong Yue Ting vs U. S., 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905; Black, Const. Law, p. 103; Thomas vs Gay, 169 U. S. 271, 18 Sup. Ct. 340, 42 L. Ed. 640. The relation of these Indians to the United States has frequently been decided as that of wards to a guardian, and that congress, by its legislation, can take whatever steps it sees fit to protect and care for these wards of the nation; and if, in the judgment of congress, it deems it for the best interests of these Indians to sell and dispose of part of their real estate for town-site purposes, there can be no question of their power and authority to do so. Such power has been exercised by the legislation of the states and by the legislation of congress over all classes of dependents, such as infants, lunatics, minors, and people in like conditon. In U. S. vs Boyd ( C. C. ) 68 Fed. 581, the court, referring to the United States, said: "They appear as sovereign of this dependent Indian community, as parens patriæ of this helpless and injured race, not yet invested with the full rights of American citizenship, and as guardian, by treaty obligations, of these ignorant and injudicious wards, to control their transactions about lands acquired by the treaty money, and the charitable trust funds bestowed by congress upon a political department of the government to be applied for the benefit of these Indian cestuis que trustent." The supreme court of the United States, in the case of Hoyt vs Sprague, 103 U. S. 634, 26 L. Ed. 585, held: "The question of the power of a legislature, when not restrained by a specific constitutional provision, to pass special laws, has been much mooted in the courts of this country; and it would subserve no useful purpose to go over the whole ground of controversy on this occasion. Suffice it to say that laws of this character, for the purpose of healing defects, giving relief, aid, and authority in cases beyond the force of existing law, have been frequently passed in almost every state in the Union, and have received the sanction not only of this court, but of other courts of high authority.

The exercise of this power has been most conspicuous in that class of cases in which the legislature has been called upon to act as parens patriæ on behalf of lunatics, minors, and other incapacitated persons. Laws authorizing the sale of the estates of such persons have frequently passed, and have been upheld as fairly within the legislative power. The passage of such laws is not the exercise of judicial power, although by general laws the discretion to pass upon such cases might be confided to the courts. But when it is not confided to the courts, the power exercised is of a legislative character, the legislature making a law for the particular case." In Davidson vs Johonnot, 7 Metc. (Mass.) 394, 41 Am. Dec. 448, the court said: "In the case of Clark vs Van Surley, 15 Wend. 436, where the rents and profits of real estate were given to the father during life, and the remainder in fee to his children, a private act of the legislature, authorizing the sale of this estate for the purpose of furnishing support for the tenant for life and his children and educating the children, was held valid. The question was fully considered and ably discussed by Mr. Justice Bronson in giving the opinion of the supreme court. This case afterwards came before the court for the correction of errors, and the decision of the supreme court was affirmed; Chancellor Walworth and Senator Verplanck concurring in the affirmance. Cochran vs Van Surley, 20 Wend. 365. * * * But the case more in point as an authoritative decision is that of Rice vs Parkman, 16 Mass. 326, where the court held that the legislature have authority to pass an act licensing the sale of real estate of a minor, and this notwithstanding they have, by a general act, delegated the same power to the judicial courts. The opinion of the court in that case, as given by the late Chief Justice Parker, is full, and to the point in controversy. He says that the power thus exercised is not judicial, 'for it was not a case of contro versy between party and party, nor is, there any decree or judgmen t affecting the title to property. The

only object of the authority granted by the legislature was
to transmute realty into personal estate for purposes bene-
ficial to all who were interested therein.' It is 'the use of
parental or tutorial power. It is, in effect, protecting him
in his property.' Again, it was there said by the court that
it was no objection that the legislature had before made a
general provision for licensing the sale of minors' estates;
nor that notice was not given to the minor before passing
the resolve.'' In Stanley vs Colt, 5 Wall. 119, 18 L. Ed.
502, the court held in substance as follows: ''Where the
legislature, setting out reasons at large for the exercise of
such a power, directs a sale of land so. devised, and provides
for the secure reinvestment of the proceeds to the same
uses as directed by the will as to the estate sold, this court
cannot revise the facts upon which the legislature has exer-
cised the power.'' See, also, Williamson vs Snydam, 6
Wall. 726, 18 L. Ed. 967; Watkins vs Holman, 16 Pet. 51, 10
L. Ed. 873; In re Ferrier, 103 Ill. 367, 43 Am. Rep. 10. The
doctrine herein contended for is fully set forth by Tiede-
man in his late work on State and Federal. Control of Per-
sons and Property (volume 2, p. 661, § 138). He says: ''138.
Involuntary Alienation. Except the power which the court
of chancery possesses in certain cases, and which, of course,
is subject to repeal or regulation by the legislature, the
power to effect an involuntary alienation rests upon legisla-
tive enactment. As a general proposition, the legislature can-
not devest one of his vested rights against his will. It can
enact laws for the control of property and of its disposition,
but it cannot take the private property of one man, and give
it to anther. But there are certain well-known exceptions to
this general rule, where the interference of the legislature is
necessary to save and protect the substantial interests of in-
dividuals on account of their own inability to do so, or to pro-
mote the public good. In some of the state constitutions there
is a provision against the enactment of special laws, operating
upon particular individuals or upon their property. In

those states, therefore, involuntary alienation can only be effected by a general law, applicable to all persons under like circumstances. But, in the absence of such a constitutional provision, the transfer of lands may be made by special acts of the legislature as well as under a general law. * * * One of the most important and the most easily justified cases of involuntary alienation is one affecting the property of persons under legal disability. Where persons are under a legal disability which prevents them from making a valid sale of their property, and such sale and reinvestment of the proceeds of sale are necessary for the conservation of their interests, the state, in the capacity of parens patriæ, has the power to authorize the sale by the guardians of such persons. This may be done by special law or by a general law. The law which imposes the disability may very properly provide against the injurious consequences of such disability. But the property of persons who are not under a disability cannot be sold by authority of the courts on the ground that such sale would be beneficial. In most of the states there are general laws authorizing the courts to empower the guardians of minors, lunatics, and other persons under disability to make sale of the real property of such persons." See, also, cases cited in note. See, also, 3 Washb. Real Prop. (4th Ed.) p. 216 et seq., and cases cited.

These lands can be sold under the exercise of the power of eminent domain. Eminent domain is the right of the government to take the property of an individual, and appropriate it to public purposes. Judge Cooley says it is the right "to appropriate and control individual property for the public benefit, as the public safety, necessity, convenience, or welfare may demand." Cooley, Const. Lim. *524. The supreme court of the United States, in U. S. vs Jones, 109 U. S. 519, 3 Sup. Ct. 346, 27 L. Ed. 1015, quotes approvingly Vattel's definition of eminent domain to be "the

right of disposing, in case of necessity, and for the public safety, of all of the wealth of the country." The restraint placed upon the government in the exercise of the power of eminent domain is found in the fifth article of the amendments to the constitution of the United States, "Nor shall private property be taken for public use without just compensation." Tied. Cont. of Pers. & Prop. § 140; Dill. Mun. Corp. § 587; Sedg. St. & Const. Law, 433, 534; People vs Smith, 21 N. Y. 595; U. S. vs Harris, 1 Sumn. 21, Fed. Cas. No. 15,315; Black, Const. Law, §§ 122, 123; Garrison vs City of New York, 21 Wall. 196, 204, 22 L Ed 612; Secombe vs Railroad Co., 23 Wall. 108, 118, 23 L. Ed. 67; U. S. vs Jones, 109 U. S. 513, 518, 27 L. Ed. 1015. Judge Cooley, in his works on Constitutional Limitations (star page 528), speaking on the subject of eminent domain, says: "Private property can only be taken pursuant to law; but a legislative act declaring the necessity, being the customary mode in which that fact is determined, must be held for this purpose the law of the land,' and no further finding or adjudication can be essential, unless the constitution of the state has expressly required it." In order that the government may take private property by virtue of its eminent domain power, two conditions must be complied with: (1) It must be taken for a public use, and (2) there must be just compensation made or provided for. Except as thus limited, the power of the government is absolute. Secombe vs Railroad Co., 23 Wall. 108, 118, 23 L. Ed. 67; Garrison vs City of New York, 21 Wall. 196, 204, 22 L. Ed. 612. What is a public use? A historical research discloses the meaning of the term "public use" to be one of constant growth. As society advances, its demands upon the individual increase, and each demand is a new use to which the resources of the individual may be devoted. Says Tiedeman in his work on State and Federal Control of Persons and Property (page 692-694): The ever increasing complications of modern civilization have compelled an application of the

right of eminent domain to other than public or government-
al uses, and the meaning of the term "public use' was
broadened from time to time in order to cover these new ap-
plications of the right, until now the term is synonymous
with 'public good.' * * * There is nothing in our con-
stitutions which requires a taking for public use. We have,
as the sole authority for the requirement, the judicial opin-
ion that it is unrepublican to take private property for any
but a public use; but we claim that the courts, at least in
later years, meant thereby that private property cannot be
taken except to promote some public good, when they re-
quire it to be a taking for public use." In People vs Town-
ship Board of Salem, 20 Mich. 452, 4 Am. Rep. 400, the
court said: "If we examine the subject critically, we shall
find that the most important consideration in the case of
eminent domain is the necessity of accomplishing some pub-
lic good which is otherwise impracticable; and we shall also
find that the law does not so much regard the means as the
end." In accord with the latter quotation are the words of
Chief Justice Marshall in McCulloch vs Maryland, 4 Wheat.
316-421, 4 L. Ed. 579: "Let the end be legitimate, let it be
within the scope of the constitution, and all means which are
appropriated, which are plainly adequate to that end, which
are not prohibited, but consist with the letter and spirit of
the constitution, are constitutional." In Oldstead vs Camp,
33 Conn. 532, 89 Am. Dec. 221, it was contended that the
term "public use" should be distinguished from the term
"public benefit," and that by "public use" was meant the
possession, occupation, and direct enjoyment by the public.
The court says: "It seems that such a limitation on the in-
tent of this important clause would be entirely different
from its accepted interpretation, and would be as unfortunate
as novel. One of the most common meanings of the word
'use,' as defined by Webster, is 'usefulness,' 'utility,' 'advant-
age,' 'productive of benefit." 'Public use' may therefore
well mean 'public usefulness, utility or advantage,' or what

is 'productive of general benefit;' so that an appropriation of private property by the state, under its right of eminent domain, for purposes of great advantage to the community, is a taking for public use.    Such, it is believed, is the construction which has uniformly been put upon the language by courts, legislatures, and legal authorities."    In the case of Talbot vs Hudson, 16 Gray, 417, the language of Chief Justice Bigelow is very full and explicit:    "If land be taken for a fort, a canal, or highway, it would clearly fall within the first class [public use].    If it were transferred from one person to another, or to several persons for their own peculiar benefit or advantage, it would clearly come within the second class [private use].    But there are intermediate cases where public and private interests are blended together, in which it becomes very difficult to decide within which of the two classes they may be said to fall.    There is no fixed rule or standard by which such cases can be tried and determined.    It must depend upon its own peculiar circumstances.    In the broad and comprehensive view such as has been heretofore taken of the construction of this clause of the declaration of right, everything which intends to enlarge the resources, and increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of a state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor, evidently contributes to the general welfare and the prosperity of the whole community."

Who determines the question that the use is a public one?    That the legislature is the sole and exclusive judge whether the exigency exists which calls on it to exercise and delegate the power of eminent domain no one will question.    Courts cannot inquire into the necessity or propriety of the exercise of the right.    U. S. vs Jones, 119 U. S. 513, 519, 7 Sup. Ct. 283, 30 L. Ed. 440; Tied. Cont. of Pers. &

Prop. § 140; Dill. Mun. Corp. § 590; Chicago, R. I. & P. R. Co. vs Town of Lake, 71 Ill. 333; Talbot vs Hudson, 16 Gray, 417. Indeed, courts have not found much trouble in going a step beyond this position, and establishing the rule to be that, when the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use is palpably without reasonable foundation. U. S. vs Gettysburg Electric Ry. Co., 160 U. S. 668, 680, 16 Sup. Ct. 427, 40 L. Ed. 576; Dorgan vs City of Boston, 12 Allen, 223; Plant vs Railroad Co., 10 Barb. 26; Seaman vs Hicks, 8 Paige, 655; Watson vs Town Council, 5 R. I. 562; U. S. vs Railroad Bridge Co., 6 McLean, 517. Fed. Cas. No. 16,114; Town of Rensselaer vs Leopold, 106 Ind. 29, 5 N. E. 761; Welton vs Dickson (Neb.) 57 N. W. 559, 22 L. R. A. 496, 41 Am. St. Rep. 771; Parham vs Justices, 9 Ga. 341. "The question whether the specified use is a public use or purpose is perhaps ultimately a judicial one, and, if so, the courts cannot be absolutely concluded by the action or opinion of the legislative department. But, if the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use is palpably private, or the necessity for taking plainly without a reasonable foundation. [Quoted with approval in U. S. vs Gettysburg Electric Ry. Co., supra.] But, if the use is public, or if it be so doubtful that the courts cannot pronounce it not to be such as to justify the compulsory taking of private property, the decision of the legislature, embodied in the enactment giving the power, that a necessity exists to take the property, is final and conclusive." Dill. Mun. Corp. § 600. "In determining it [public use] we must look to the declared purpose of the act; and, if a public use is declared, it will be so held, unless it manifestly appears by the provisions of the act that they can have no tendency to advance and promote such public use." Shaw, C. J., in Hazen vs Essex Co., 12 Cush. 475; Tied. Cont. of Pers. & Prop. p. 690. It is not necessary that the act de-

clare the purpose of the taking to be public. The court will infer it from the act. Cherokee Nation vs Southern Kansas Ry. Co., 135 U S. 641, 657, 10 Sup. Ct. 965, 34 L. Ed. 295; Dill. Mun. Corp. § 601; U. S. vs Gettysburg Electric Ry., 160 U. S. 668, 680, 16 Sup. Ct. 427, 40 L. Ed. 576. So far as the question of just or reasonable compensation is concerned, the plaintiff, Moore, in this case, has no vested interest, and "the right to compensation * * * does not exist in cases where the right to the property taken is not absolutely vested at the time of the legislative act affecting it." Dill. Mun. Corp. § 587.

There is no complaint that the appraisement made by appellants is not satisfactory, and the legislation of the act of June 28, 1898, amply provides for compensation as the property to be sold has been made valuable by the owners of the improvements, and the Creek Nation gets the proceeds of the sale. It is too late for these tribal governments or their individual citizens to obstruct and render nugatory the legislation of congress that has for its object the education and civilization of these Indians, and the making of them good and worthy citizens of the United States, and their country a rich and prosperous state of the union. Neither the complaint of the, plaintiff nor the petition of the Creek Nation stated a cause of action. Neither has this court any jurisdiction of the questions here presented, and the demurrer of the appellants on these grounds should have been sustained. The case is reversed and remanded, with directions to dissolve the injunction and dismiss the bill, with judgment against appellees for the costs.

GILL and RAYMOND, JJ., concur.

CLAYTON, J. (dissenting) I concur with the majority of the court as to the conclusions reached in this case to the effect that the Curtis bill, relating to the matter in controversy, is constitutional, and that the cause should be re-

versed; but I dissent as to all that part of the opinion which founds the power of the government to take and sell the Indian lands within the limits of a city or town upon the government's power of eminent domain. That the power of eminent domain in the Indian Territory is in the United States government is unquestioned, but that the government, because of that power, can sell the lands of Indians to private citizens, to be used by them for private purposes, I deny. The fee-simple title to these lands is in the Indians, both by the act of congress and the very terms of the patent executed to them by the United States, their grantee. See act of congress approved May 28, 1830 (4 Stat. 412), and patent executed thereunder. They hold their lands, except as to a limitation upon their right of alienation, as does any private citizen in the state; and, if the power of eminent domain is to apply, it must necessarily be governed by the same rule in both cases. By the terms of the Curtis bill, all of the lands in cities and towns is to be disposed of as follows: (1) Improved lots are to be appraised, and the owners of the improvements are to be allowed to retain one lot upon which a dwelling may stand, and one lot upon which may have been erected a business house, for which he is to pay a certain percentage of the appraised value of the lot. (2) Unimproved lots are to be sold at public auction by the agents and officers of the United States, to private individuals, or at least to any person who may buy, to be used for any lawful purpose he may desire, the proceeds to be paid to the Indians. (3) Streets, alleys, parks, and cemeteries, the only portion of the land taken which is to be set apart for the use of the public, are not to be sold at all; and no provisions are made by the act to extinguish the Indian title, nor to compensate them for the land taken for these purposes. The very fact that no provision is made for the extinguishment of the Indian title to any of the land which is to be taken for public uses, and that none of the land for which they are to receive compensation is to be used for

public purposes, is, to my mind, convincing proof that congress did not intend to take their lands, and dispose of them by virtue of the powers of eminent domain, nor had they the power to do so. The majority of the court are of the opinion that because the taking of the land, independent of the uses to which it is to be applied, is for the benefit of the public, and because congress has, in their opinion, so declared, that this brings the right to take and dispose of the land under the act within the powers to be exercised by congress under its power of eminent domain, to all of which I respectfully dissent. It is true that congress has the sole power, beyond the control of the courts, to determine the purpose for which the power of eminent domain may be exercised; but this is a very different question from that of the uses to which the property condemned is to be subjected, whether public or private. The first, the legislature must determine; the second, the courts. Mr. Lewis in his work on Eminent Domain, lays down the rule to be: "Some courts have held that, in order to uphold an exercise of the power of eminent domain, a necessity must exist for its exercise, in order to accomplish the purpose sought, and that this question of necessity is in some way an element in determining whether the taking is for public use. Thus it is argued that a hotel or theater is not a public use within the meaning of the constitution, because the public can be accommodated in those respects without resorting to the power of eminent domain. Nearly all the cases hold, however, that the question of necessity is distinct from the question of public use, and that the former question is for the legislature. The necessity, expediency, or propriety of the power of eminent domain, and the extent and manner of exercise, are questions of general public policy and belong to the legislative department of the government. They have nothing to do with the question of what constitutes public use. Many courts seem to treat the question of what is public use as though the question was, for what purposes

may the power of eminent domain be properly exercised? This is a serious error. The power of eminent domain, as we have before shown, is the power of a sovereign state to appropriate private property to particular uses for the purpose of promoting the general welfare. This power was originally in the people in their sovereign capacity, and was by them delegated to the legislature in the general grant of legislative power. In the absence of any restrictions, the legislature could take private property for any purpose calculated to promote the public good. By the provision in question the people said to the legislature, in effect, 'You shall not exercise this power except for public use.' T o give these words any effect, they must be construed as limiting the power to which they relate; that is, as limiting the purposes for which private property may be appropriated. As the power is, by its nature, limited to such purposes as promote the general welfare, it is evident that the words 'public use' if they are to be construed as a limitation, cannot be equivalent to the general welfare or public good. They must receive a more restricted definition. It is, of course, impossible to reconcile these different views, and the question is, which one is correct? 'The meaning of the words cannot be ascertained by reading the constitution. No attempt is there made to define them. Nor is there any clause in that instrument which, by its bearing upon them, teaches us the precise meaning which they were intended to have. We must, therefore, look elsewhere for a true construction.' If we look to our dictionaries, we find the same confusion as in the decisions. Thus 'use' is defined as: First. 'The act of employing anything, or the state of being employed for any purpose; application; employment; service.' Second. 'The quality that makes a thing proper for a purpose; benefit; utility; advantage.' To constitute a public use according to the first of these definitions, it is necessary that the public should in some way use, or be entitled to use or enjoy, the property taken. According to the

second definition, it would be a public use if the 'property so taken was so employed as to inure in some way to the public benefit or advantage. If we go back a century, and place ourselves in the situation of those who framed the constitution of the original state, we shall find that the principal purposes, if not the only purposes, for which private property was appropriated, were for ways and mills. The mills were mostly sawmills and gristmills, and were accustomed, and in most cases obliged, to saw and grind for toll for whomsoever applied. They were for public use in the stricter sense of the phrase. There was nothing in the practice of the states, at the time the earlier constitutions were adopted, to require that the words 'public use' should have the meaning of 'public benefit or advantage.' The use of a thing is strictly and properly the employment or application of a thing in some manner. The public use of anything is the employment or application of the same by the public. Public use means the same as use by the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are: First, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier constitutions; third, it is the only view which gives the words any force as a limitation, or renders them capable of any definite and practical application. If the constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public retains certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the public, then the property is not taken for public use, and the acts of appropriation are void.

This interpretation will cover every case of appropriation that has been deemed lawful by any court except a few in relation to mills, mines and drainage. If exceptional circumstances require exceptional legislation in those respects in any state, it is very easy to provide for it specially in the constitution, as has been done in several states." Lewis, Em. Dom. Secs. 163-165. In my opinion Mr. Lewis lays down the correct view. I cannot see how the taking of private property from one man, against his will, to be sold to another for the purpose of using it for a dwelling, a storehouse, a butcher shop, a slaughter pen, or any other private purpose, is taking it for public use. If so, the legislature, exercising the power of eminent domain of the government, might say that the public interests of the town in which I live demands the erection and operation of a bowling alley, and for that purpose condemn my house, and cause it to be sold, against my will, to any private citizen, to be used for that purpose; of course, compensating me for the same. There are many persons who believe that it would be to the public interest to suppress the sale of all intoxicating liquors; but, because of that, would any one contend that the legislature, by virtue of the power of eminent domain, could condemn the house and real estate where liquor was being sold, and sell it to others, to be used in other private business? If so, some anti-tobacco legislature might deem that the raising of tobacco was against the public interest, and proceed to condemn and sell all farms upon which tobacco was being raised to other farmers, who would use it for the purpose of raising other products which to the law-making power might seem legitimate. In my opinion, "the necessity, expediency, or the propriety of the exercise of the power of eminent domain" is exclusively for the legislature to determine; but what is a public use, or whether the property sought to be condemned is being applied to a public use, is for the courts; and property is not applied to a public use unless in some way or other it is to be

used by the public. Congress has nowhere declared that the real estate belonging to the Indians in the cities and towns of the Indian Territory is to be applied to any public use except streets, alleys, cemeteries, and parks, and, as before stated, as to them, has taken no steps to sell or compensate the Indian tribes for them.