ANSLEY, et al, vs AINSWORTH, et al.

Opinion delivered September 25, 1902.

1. *Indian Treaties—Choctaw Constitution—Vested Rights.*

Section 18, Article 7, Choctaw Constitution giving an individual citizen discoverer of coal mines, the exclusive privilege to benefit by same does not confer vested rights upon such discoverer such as cannot be taken away by subsequent legislation of Congress; for if such was the effect of such Constitution, the same would be in violation of the provisions of the Treaty of 1855 and, therefore, void.

2. *Indian Treaties—Abrogated by Congressional Legislation—Status of Indians and Indian Nations.*

The Indians and Indian Nations in the Indian Territory have always been and now are "wards of the Nation" and have never been constituted an independent soverign people within their own limits. By the enactment of the Act of Congress June 28, 1898, any provisions of former constitutions or laws of the Indian nations, or treaties with them, or contracts existing thereunder, in conflict with the terms of that Act of Congress were, by its adoption abrogated and annulled.

3. *Constitutional Law—Impairment of Contracts.*

The constitutional inhibition against the passage of laws impairing the obligation of contracts is a limitation upon the powers of the states, but not upon those of Congress.

4. *Atoka Agreement—Validity of—Not Assailable by Judicial Inquiry into Coercion of Framers.*

A contention that the Atoka Agreement is invalid because of duress and coercion exercised in securing its adoption, involves a judicial inquiry into motives and influences controlling congressional enactment, and that is beyond the sphere of judicial cognizance.

5. *Atoka Agreement—Validity of—Delegation of Legislative Power.*

>   The Atoka Agreement is not invalid on the ground that in submitting
>   the same to a vote of the members of the Choctaw and Chickasaw
>   Nations for ratification before becoming effective Congress delegated
>   its legislative power in violation of Sections 1 and 7, Article 1,
>   Constitution U. S.

Appeal from the United States Court for the Central District.

WM. H. H. CLAYTON, Judge.

Action by W. H. Ansley and others against N. B. Ainsworth and others. Judgment for defendants. Plaintiffs appeal. Affirmed.

The amended complaint in this action was filed March, 31 1899, by the plaintiffs below, appellants here, against the defendants below, appellees here, in which plaintiffs alleged that plaintiff W. H. Ansley is a Choctaw Indian by blood, and that plaintiffs M. H. Gleason and R. O. Edmonds are citizens of the Choctaw Nation by intermarriage; that defendant N. B. Ainsworth is a citizen of the Choctaw Nation, and defendant L. C. Burriss is a citizen of the Chickasaw Nation, and the two are the coal trustees for the Choctaw and Chickasaw Nations, appointed by the President of the United States, under and by virtue of the provisions of the Atoka agreement, contained in the act of congress approved June 28, 1898, and known as the Curtis Bill; that defendants Woods and Elliott are citizens of the United States, and defendant the Ola Coal & Mining Company is a corporation organized under the laws of Kansas. Plaintiffs further allege that the plaintiffs Gleason and Edmonds, together with one Lorin A. Riddle, a citizen of the Choctaw Nation by blood, prospected for and discovered coal in the Choctaw Nation at a point where coal was not theretofore known to exist; that on

December 8, 1896, the plaintiffs Gleason and Edmonds, with said Riddle, entered into a contract with defendant O. E. Woods "whereby the said Woods was authorized and permitted to conduct mining operations and to mine coal on the coal claim or discovery above described for the period of six years from the date of said contract, in consideration of his paying to said plaintiffs and said Lorin A. Riddle a royalty of one-fourth of one cent per bushel on all coal mined on said discovery or coal claim, which was the customary royalty, and upon his compliance with the laws of the Choctaw Nation in such mining operations applicable; that the said Woods, by arrangement and agreement with the defendant the Ola Coal & Mining Company, authorized said company to mine coal within the limits of said coal claim or discovery as above described; that the terms of said agreement are not known to these plaintiffs, and cannot more particularly be set out, but under such agreement said Ola Coal & Mining Company became bound to pay plaintiffs royalty on coal produced by it on the coal claim aforesaid according to the terms of the original agreement between Woods and plaintiffs Gleason Edmonds, and said Lorin A. Riddle; that said O. E. Woods and said Ola Coal & Mining Company have, under the contract from plaintiffs aforesaid, mined coal within the limits of said coal claim or discovery as above described, to the amount of ——— tons; that for said coal so mined by them they are indebted to plaintiffs in the sum of eleven hundred dollars, which is due and payable." On February 28, 1898, the said Riddle sold his undivided one-third interest in said dscovery to the plaintiff W. H. Ansley. The plaintiffs in their said amended complaint have alleged and set out fully and with great particularity the provisions of the treaties between the United States and the Choctaw Indians, and between the Choctaw and Chickasaw tribes or Nations of Indians, and the treaties between the United States and the Choctaw and Chickasaw tribes of Indians, also the provisions of the Choctaw constitu-

tion, and certain acts of the Choctaw council passed in accordance with the provisions of said constitution, and the laws, usages and customs of the Choctaw Nation of Indians; and plaintiffs say that under and by virtue of the various provisions in said treaties mentioned and described, and the provisions of said Choctaw constitution and the said acts of the Choctaw council referred to, and the laws, usages, and customs of the said Choctaw Nation of Indians, the plaintiffs "acquired the right to mine coal within a circle having a radius of one mile, and beginning at the point of excavating coal as aforesaid, and to give, bequeath, sell, transfer, convey, or assign said right to any other Choctaw citizen, and to contract by lease or otherwise with any person, company, or corporation to mine coal for a period of years within the circle aforesaid, to the exclusion of any other persons, companies, or corporations, whatsoever so long as said persons, companies, or corporations complied with the laws of the Choctaw Nation to them and their mining operations applicable; that said right of plaintiffs, as thus stated, became vested, absolute, and indefeasible so long as they chose to exercise the same. Plaintiffs further aver: That by Section 16 of an act of congress entitled 'An act for the protection of the people of the Indian Territory, and for other purposes,' approved June 28, 1898, it was made unlawful for any person, after the passage of said act, to claim, demand, or receive, for his own use or the use of any one else, any royalty on oil, coal, asphalt, or other mineral within the limits of any of the tribes in the Indian Territory, or for any one to pay any individual any such royalties or rents, or any consideration therefor whatsoever. That under the agreement contained in said act, among other provisions, it was provided as follows: 'It is agreed that all the coal and asphalt within the limit of the Choctaw and Chickasaw Nations shall remain and be the common property of the members of the Choctaw and Chickasaw tribes (freedmen excepted), so that each and every member shall have an equal and undivided interest in the

whole. All agreements heretofore made by any persons or corporation with any member or members of the Choctaw and Chickasaw Nations, the object of which was to obtain such member or members' permission to operate coal or asphalt, are hereby declared void.' That by the provisions of said agreement as above set out, and by the acts of the defendants Woods, Elliott, and the Ola Coal & Mining Company in refusing to pay the royalties due to plaintiffs as aforesaid, because of the provisions of sections 16 and 18 of the act of congress above set out, and their proposed payment, unless restrained by the action of this court, of said royalties into the treasury of the United States, as aforesaid, plaintiffs are deprived of their property without notice, without hearing and in violation of the fifth amendment to the constitution of the United States, wherein it is provided that no person shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation, and in violation of section 1 of the fourteenth amendment to the constitution of the United States, by which it is provided that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. That such agreement affects the title to the land belonging to the Choctaw and Chickasaw people by grant from the United States, and a patent executed in pursuance thereof, as well as the other property of the Choctaw and Chickasaw people, these plaintiffs inclusive. That by virtue of such agreement the property rights of the Choctaw and Chickasaw people in general, and of these plaintiffs in their coal discovery, as above set out, in particular, were changed, modified, and in the latter case, destroyed, by an agreement against which nearly one-half of the votes cast were recorded, and which was submitted in accordance with none of the forms of procedure of the Choctaw or Chickasaw

Nation, as provided by their constitution and laws made in pursuance of treaties with the United States. Plaintiffs further aver that said agreement, so far as it impairs, destroys, modifies, or changes the property rights of the citizens of the Choctaw Nation and of these plaintiffs, is inoperative and void. That the agreement aforesaid, and all the provisions of the act of June 28, 1898, not therein contained which impaired or affected the property rights of the Choctaw and Chickasaw Nations, and of the members thereof individually, and so far as they affected or impaired the rights of these plaintiffs in their coal claim aforesaid, are inoperative and void because in said act and in said agreement, and by the mode of their enactment and adoption, congress delegated its powers of legislation to the voters of the Choctaw and Chickasaw Naions, in violation of sections 1 and 7 of article 1 of the constitution of the United States."

The foregoing will to some extent, at least, present the allegations set out by the plaintiffs, under and by virtue of which they ask the court to enjoin and restrain the defendants Woods, Elliott, and the coal company from applying for a lease to the defendants Ainsworth and Burriss, the said coal trustees, and to restrain said trustees from proceeding under and by virtue of the provisions of said agreement.

On January 20, 1899, defendants entered their appearance as follows: "On this day come the defendants, N. B. Ainsworth, L. C. Burriss, James Elliott, O. E. Woods, and the Ola Coal & Mining Company, and waiving summons herein, enter an appearance in the above-entitled cause, and agree that the court may hear and determine the same, and render final judgment upon the merits at the present term of this court. (Signed) N. B. Ainsworth, L. C. Burriss, by John H, Wilkins, United States Attorney, Representing said Defendants Ex Officio, James Elliott, O. E. Woods, Ola Coal & Mining Company, by W. J. Horton, Their Attorney." On March 31, 1899, defendants filed their demurrer,

as follows: "Now, on this day come the defendants, N. B. Ainsworth, L. C. Burriss, James Elliott, O. E. Woods, and the Ola Coal & Mining Company, and demur to the amended complaint herein, and for grounds therefor say: First, that the complaint does not state facts sufficient to constitute a cause of action; second, that the complaint does not state facts sufficient to constitute an equitable cause of action. (Signed) John H. Wilkins, United States Attorney, Representing Coal Trustees, Ex Officio. W. J. Horton, Attorney for Ola Coal & Mining Company." On the same day the court rendered its decree as follows; "On this 31st day of March, 1899, the above-entitled cause came regularly on for hearing; the defendants, N. B. Ainsworth, L. C. Burriss, O. E. Woods, James Elliott, and the Ola Coal & Mining Company having heretofore entered their appearance and agreed that the cause might be heard and finally determined at the present term of court. Plaintiffs, by leave of court first obtained, filed an amended complaint herein, and defendants filed demurrer thereto. The court, after hearing argument of counsel for plaintiffs and defendants, respectively, and being fully advised in the premises, is of opinion that plaintiff's amended complaint is without equity and doth sustain defendant's demurrer to same; and, plaintiffs declining to plead further herein, it is by the court considered, ordered, adjudged, and decreed that said amended complaint, wherein W. H. Ansley, M. H. Gleason, and R. O. Edmonds are plaintiffs, and N. B. Ainsworth, L. C. Burriss, O. E. Woods, James Elliott, and the Ola Coal & Mining Company are defendants, be, and the same is hereby, dismissed, and it is further considered, adjudged, and decreed by the court that defendants have and recover of plaintiffs their costs in this behalf expended, for which they may have execution; to which action of the court in sustaining said demurrer and entering this decree plaintiffs in open court except." On March 14, 1902, petition for appeal was filed with the clerk of this court, which was granted on the same day.

*Yancy Lewis* and *J. H. Gordon*, for appellants.

*J. W. McLoud*, for appellees.

Towsend J.    The appellants have filed four assignments of error, as follows: "First.    The court erred in holding that the amended complaint in this cause does not state facts sufficient to constitute a cause of action.    Second.    The court erred in holding that the amended complaint in this cause does not state facts sufficient to constitute an equitable cause of action, and in holding that the amended complaint in this cause is without equity.    Third.    The court erred in sustaining the demurrer of the defendants to plaintiffs' amended complaint.    Fourth.    The court erred in rendering judgment in favor of defendants in this cause upon the demurrer filed herein."    The appellants, in their brief, in discussing said assignments of error, submit five separate propositions, and make an argument and cite authorities in support of each one.    They are, in substance, as follows: "First. That the right of coal discoverers and their assigns in the Choctaw Nation is a vested right, under the constitution and laws of the United States.    Second.    Is the existence of such right in conflict with the laws or the provisions of the treaties between the United States and the Choctaw Nation?    Third.    If revocable at all, the right could only be revoked in the method provided by the constitution and laws of the Choctaw Nation, adopted with the authority conferred by the United States in its treaties and legislation.    Fourth.    The Atoka agreement adopted by the votes of the Choctaw and Chickasaw Nations, is ineffectual as a revocation of said rights, in view of the duress and coercion alleged against the validity of that agreement. Fifth.    The act of congress of June 28, 1898, and the Atoka agreement are both void because of the fact that in the enactment of the one and in the ratification of the other by the congress, and in the provision that the agreement should supersede the act if adopted at an election held in the Choctaw and

Chickasaw Nations, the congress of the United States delegated its legislative power, in violation or sections 1 and 7 of article 1 of the constitution of the United States."

The amended complaint and the demurrer to same were filed, and the judgment of the court below was rendered, on March 31, 1899, about six weeks prior to the handing down of the decision in the case of Stephens vs Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041, which was on May 15, 1899, and which decision practically settles the controversy in this action. The citation of that case, in our judgment, furnishes ample authority to authorize this court in an affirmance of the judgment of the court below; but the appeal to this court was not taken until March 14, 1902, long after the decision in the Stephens Case, and hence we can only infer that appellants are not willing to accept the conclusions arrived at in that case, and are desirous to again bring the questions to the attention of that court. This, perhaps, will justify this court in briefly stating its views upon the question presented.

Appellants quote the treaty of 1820 as the basis of their rights. It appears in the preamble of said treaty that the Choc- taws ceded a small portion of their lands in Mississippi for "a country beyond the Mississippi river, where all who live by hunt- ing and will not work may be collected and settled together." The United States, through its commissioners, agree "to give to each warrior a blanket, kettle, rifle gun, bullet moulds and nippers, and ammunition sufficient for hunting and defence, for one year. Said warrior shall also be supplied with corn to support him and his family, for the same period, and whilst traveling to the country above ceded to the Choctaw Nation." 7 Stat. 212, art. 5. They also agree to furnish them an agent, a blacksmith, and a factor to supply them with goods. This treaty clearly indicates the supervision and guardianship that the government

proposed to take of these Indians; and to assume that the words "cede to said nation" means an absolute title to the land is giving a technical character to the said expression wholly at variance with the title then enjoyed by Indians, who never had been granted anything but the right of occupancy. Appellants concede, however, that by the treaty of 1830 it was changed into a base or qualified fee, and subsequently, in 1842, the same was carried into the patent, which is as follows: "Now, know ye that the United States of America, in consideration of the premises, and in execution of the agreement and stipulation in the aforesaid treaty, have given and granted, and by these presents do give and grant, unto the said Choctaw Nation, the aforesaid tract of country west of the Mississippi, to have and to hold the same, with all the rights, privileges, immunities, and appurtenances of whatsoever nature thereunto belonging, as intended to be conveyed by the aforesaid article, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it, liable to no transfer or alienation except to the United States, or with their consent." This latter treaty and patent simply expressed what was meant by the treaty of 1820. In 1837 an agreement was made between the Choctaws and Chickasaws. The first article of said agreement is as follows:

"It is agreed by the Choctaws that the Chickasaws shall have the privilege of forming a district within the limits of their country, to be held on the same terms that the Choctaws now hold it, except the right of disposing of it (which is held in common with the Choctaws and Chickasaws) 'to be called the Chickasaw District of the Choctaw Nation; to have an equal representation in their general council, and to be placed on an equal footing in every other respect with any of the other districts of said nation, except a voice in the management of the consideration which is given for these rights and privileges; and the Chickasaw people to be entitled to all the rights and privileges

of Choctaws, with the exception of participating in the Choctaw annuities and the consideration to be paid for these rights and privileges, and to be subject to the same laws to which the Choctaws are; but the Chickasaws reserve to themselves the sole right and privilege of controlling and managing the residue of their funds so far as is consistent with the late treaty between the said people and the government of the United States, and of making such regulations and electing officers for that purpose as they may think proper." In 1855 a treaty was made between the United States and the Choctaws and Chickasaws, the first article of which provides as follows: "The following shall constitute and remain the boundaries of the Choctaw and Chickasaw country, namely: Beginning at a point on the Arkansas river one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running thence south to Red river; thence up Red river to the point where the meridian of one hundred degrees west longitude crosses the same; thence north and along said meridian to the main Canadian river; thence down said river to its junction with the Arkansas river; thence down said river to the place of beginning. And pursuant to the act of congress approved May 28, 1830, the United States do hereby forever secure and guaranty the lands embraced within the said limits to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common, so that each and every member of either tribe shall have an equal, undivided interest in the whole: provided, however, no part thereof shall ever be sold without the consent of both tribes, and that said land shall revert to the United States if said Indians and their heirs become extinct or abandon the same." The twenty-first article of said treaty provided as follows: "This convention shall supersede and take the place of all former treaties between the United States and the Choctaws and also of all treaty stipulations between the United States

and the Chickasaws and between the Choctaws and the Chick-
asaws inconsistent with this agreement, and shall take effect
and be obligatory upon the contracting parties from date hereof
whenever the same shall be ratified by the respective councils
of the Choctaw and Chickasaw tribes and by the President and
Senate of the United States." The right to the possession of
the lands being thus held in common thereafter. While the titles
were in this condition the Choctaw Nation, in 1859, ordained and
established a constitution, which, by section 18 of article 7 pro-
vided as follows: "Any citizen of this nation who may find any
mine or mines or mineral waters shall have exclusive right and
privilege to work the same so long as he may choose, within
one mile in any direction from his works or improvements:
provided, however, he does not interfere with the rights of the
former settler."

It is under this provision of the Choctaw constitution tha
the "vested right" that appellants insist that they possess was
secured. The court below, as quoted in the brief of appellees,
very clearly states why such a vested right could not exist, and
we approve his conclusions. They are as follows: "'Article 1
of the treaty of 1855, after defining the boundaries of the Choctaw
and Chickasaw Nations, provides as follows: "And pursuant to
an act of congress approved May 28, 1830, the United States do
hereby forever secure and guaranty the lands embraced within
said limits to the members of the Choctaw and Chickasaw
tribes, their heirs and successors, to hold in common, so that
each and every member of either tribe shall have an equal un-
divided interest in the whole: provided, however, no part thereof
shall ever be sold without the consent of both tribes, and that
said lands shall revert to the United States if said Indians and
their heirs become exitnct or abandon the same." Article 11
of the treaty of 1866 in part provides: "Whereas, the land occu-
pied by the Choctaw and Chickasaw Nations, and described in

the treaty between the United States and said nations of June 22, 1855, is now held by the members of said nation in common,"! etc. Whether the treaty of 1855 be taken as an interpretation of the terms of the grant made by the parties to it, or as the ingrafting of a new condition in it, is immaterial, because, in any view of the case, after the execution of the treaty its terms would be binding. Therefore the United States had been treating with the Choctaws alone in relation to their lands. Now a new party in interest appears. The Chickasaws, with the consent of the United States, had bought an interest in them, and it became necessary to define the rights and title of all. I think there can be no doubt but that these Indians hold their lands as tenants in common, at least since the treaty of 1855; but by that treaty the United States is made to guaranty to each Indian an enjoyment of an equal undivided share of these lands, and the Choctaws agree with the Chickasaws that it shall be done. The constitution, containing the provision by virtue of which the plaintiff claims title, was not adopted until 1860,—five years after the treaty of 1855 was ratified,—and neither the United States nor the Chickasaw Nation were parties to it. The United States had the right, by virtue of its superior soverignty over these Indian tribes, and its guardianship over their wards, which has always been recognized, to make such an agreement with them and enforce it. If the eighteenth section of article 7 of the Choctaw constitution was intednd to vest an indefeasible title to the coal mines in the discoverer, it would be in violation of two of the provisions of the treaty of 1855; first, it would be an appropriation and a sale of the realty without the consent of the Chickasaws; and, second, it would be in violation of that clause of the treaty which provides that the lands shall be held in common, so that each and every member of cither tribe shall have an equal, undivided, interest in the whole. I therefore hold that, if the language of the constitution is to be construed as granting to the discoverer of mines in the Choctaw Nation an indefeasible

title or right to the mine discovered by him as to the underlying coal it is void, as being in conflict with the treaty of 1855.'" And in Stephens vs Cherokee Nation, 174 U. S. 445,. 19 Sup. Ct. 722, 43 L. Ed. 1041, Chief Justice Fuller (on page 488, .174 U. S. page 738, 19 Sup. Ct., and page 1041, 43 L. Ed.) says "The lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership, and the assertion by any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms."

The Atoka agreement provides as follows: "It is agreed that all the coal and asphalt within the limit of the Choctaw and Chickasaw Nations shall remain and be the common property of the members of the Choctaw and Chickasaw tribes (freedmen excepted), so that each and every member shall have an equal and undivided interest in the whole. All agreements heretofore made by any person or corporation with any member or members of the Choctaw and Chickasaw Nations the object of which was to obtain such member or members' permission to operate coal or asphalt, are hereby declared void." It certainly appears that the right of discoverers of coal, under the Choctaw constitution, as asserted in this action, are in conflict with the foregoing provisions. It is too late for the contention made by appellants to have any standing. The control exercised by congress over these Indians has been upheld by the Supreme Court of the United States in numerous cases. Chief Justice Fuller, in the case of Stephens vs Cherokee Nation, 174 U. S. 484, 19 Sup Ct.. 736, 43 L. Ed. 1041, says: " As to the general power of congress, we need not review the decisions on the subject, as they are sufficiently referred to by Mr. Justice Harlan in Cherokee Nation vs Southern Kansas R. Co., 135 U. S. 641, 653, 10 Sup. Ct. 969, 34 L. Ed. 295, from whose opinion we quote as follows: 'The proposition that the Cherokee Nation is sovereign in the sense

(22)

that the United States is sovereign, or in the sense that the several states are sovereign, and that that nation alone can exercise the power of eminent domain within its limits, finds no support in the numerous treaties with the Cherokee Indians or in the decisions of this court, or in the acts of congress defining the relations of that people with the United States. From the beginning of the government to the present time, they have been treated as "wards of the nation," "in a state of pupilage," "dependant political communities," holding such relations to the general government that they and their country, as declared by Chief Justice Marshall in Cherokee Nation vs Georgia, 5 Pet. 1, 17, 8 L. Ed. 25. "are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our territory and an act of hostility." It is true, as declared in Worcester vs Georgia, 6 Pet. 515, 557, 569, 8 L. Ed. 483, that the treaties and laws of the United States contemplate the Indian Territory as completely separated from the states, and the Cherokee Nation, as a distinct community, and, in the language of Mr. Justice McLean in the same case (page 583, 6 Pet., and page 483, 8 L. Ed.), that, "in the executive, legislative, and judicial branches of our government we have admitted, by the most solemn sanction, the existence of the Indians as a separate and distinct people, and as being vested with rights which constitute them a state or separate community." But that falls far short of saying that they are a sovereign state, with no superior within the limits of its territory. By the treaty of New Echota (1835) the United States covenanted and agreed that the lands ceded to the Cherokee Nation should at no future time, without their consent, be included within the territorial limits or jurisdiction of any state or territory, and that the government would secure to that nation "the right by their national councils to make and carry into

effect all such laws as they may deem necessary for the government of the persons and property within their own country, belonging to their people or such persons as have connected themselves with them"; and by the treaties of Washington (1846 and 1866) the United States guaranteed to the Cherokees the title and possession of their lands, and jurisdiction over their country. Revision of Indian Treaties, pp. 65, 79, 85. But neither these nor any previous treaties evinced any intention upon the part of the government to discharge them from their condition of pupilage or dependency, and constitute them a separate, independent, sovereign people, with no superior within its limits. This is made clear by the decisions of this court rendered since the cases already cited. In U. S.vs Rogers, 4 How. 567, 572, 11 L. Ed. 1105, the court, referring to the locality in which a particular crime had been committed, said: "It is true that it is occupied by the tribe of Cherokee Indians. But it has been assigned to them by the United States as a place of domicile for the tribe, and they hold and occupy it with the consent of the United States ,and under their authority. * * * We think it too firmly and clearly established to admit of dispute that the Indian tribes residing within the territorial limits of the United States are subject to their authority." In U. S. vs Kagama, 118 U. S. 375, 379, 6 Sup. Ct. 1109, 30 L. Ed. 228, the court, after observing that the Indians were within the geographical limits of the United States, said: "The soil and the people within these limits are under the political control of the government of the United States, or of the states of the Union. There exist within the broad domain of sovereignity but these two. * * * They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union, or of the state within whose limits

they resided. * * * The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government because it has never existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes." The latest utterance upon this general subject is in Choctaw Nation vs U. S., 119 U. S. 1, 27, 7 Sup. Ct. 75, 30 L. Ed. 306, where the court, after stating that the United States is a sovereign nation, limited only by its own constitution, said: "On the other hand, the Choctaw Nation falls within the description in the terms of our constitution, not of an independent state or sovereign nation, but of an Indian tribe. As such, it stands in a peculiar relation to the United States. It was capable, under the terms of the constitution, of entering into treaty relations with the government of the United States, although, from the nature of the case, subject to the power and authority of the laws of the United States when congress should choose, as it did determine in the act of March 3, 1871, embodied in section 2079 of the Revised Statutes, to exert its legislative power.'" And it is further decided that whenever congress does supersede a treaty, and any question arises, it is not within the sphere of judicial cognizance. "It is well settled that an act of congress may supersede a prior treaty, and that any questions that may arise are beyond the sphere of judicial cognizance, and must be met by the political department of the government. 'It need hardly be said that a treaty cannot change the constitution, or be held valid if it be in violation of that instrument. This results from the nature and fundamental principles of our government. The effect of treaties and acts of congress, when in conflict, is not settled by the constitution. But the question is not involved in any doubt as to its proper solution. A treaty may supersede

a prior act of congress, and an act of congress may supersede a prior treaty. Foster vs Neilson, 2 Pet. 253, 314, 7 L. Ed. 415. Taylor vs Morton, 2 Curt. 454, Fed. Cas. No. 13,799. In the cases referred to, these principles were applied to treaties with foreign nations. Treaties with Indian nations within the jurisdiction of the United States, whatever considerations of humanity and good faith may be involved and require their faithful observance, cannot be more obligatory. * * * In the case under consideration the act of congress must prevail as if the treaty were not an element to be considered." The Cherokee Tobacco, 11 Wall. 616, 20 L. Ed. 227. That was a case where an act of congress extended the revenue laws, as respected tobacco, over the Indian territories, regardless of provisions in prior treaties that exempted tobacco raised by Indians on their reservations." Thomas vs Gay, 169 U. S. 271, 18 Sup. Ct. 340, 42 L. Ed. 740.

The power of congress over these Indians being thus unlimited, if congress saw fit, in its wisdom, to adopt the Atoka agreement, and authorize the Choctaw and Chickasaw Nations to also adopt it, any provisions of former treaties, constitutions, or contracts existing under them, in conflict with the same, are simply abrogated and annulled, and the courts cannot take cognizance of the questions thus arising. It will also be observed: "The constitutional inhibition against the passage of laws impairing the obligation of contracts is a limitation upon the powers of the state, but not upon those of congress." Evans-Snider-Buel Co. vs McFadden, 44 C. C. A. 494, 105 Fed. 293.

The question of duress and coercion, which, it is argued, was exercised by congress in the adoption of the Atoka agreement, involves an investigation into the motives and influences that controlled congress in this enactment. This is also beyond the sphere of judicial cognizance. "It is beyond the power of this

court to question the good faith of congress, and it is never to be presumed that an act of a legislature is not bona fide. As was said by Chief Justice Fuller in the case of United States vs Old Settlers, 148 U. S. 466, 13 Sup. Ct. 650, 37 L. Ed. 509, in reviewing the case of U. S. vs Arredondo, 6 Pet. 691, 8 L. Ed. 547: 'It will be perceived that this decision is not authority for the proposition that a court may be clothed with power to annul a treaty on the ground of fraud or duress in its execution. * * * Unquestionably a treaty may be modified or abrogated by an act of congress, but the power to make and unmake is essentially political, and not judicial, and the presumption is wholly inadmissible that congress sought in this instance to submit the good faith of its own action or the action of the government to judicial decision.' In the case of Whitney vs Robertson, 124 U. S. 190, 194, 8 Sup. Ct. 456, 31 L. Ed. 386, Justice Field states with approval the effect of the decision of Taylor vs Morton, 2 Curt. 454, 459, Fed. Cas. No. 13,799, as follows: 'Whether the consideration of a particular stipulation of the treaty had been voluntarily withdrawn by one party, so that it was no longer obligatory on the other; whether the views and acts of a foreign sovereign had given just occasion to the legislative department of our government to withhold the execution of a promise contained in a treaty, or to act in direct contravention of such promise,—were not judicial questions; that the power to determine these matters had not been confided to the judiciary, which has no suitable means to exercise it, but to the executive and legislative departments of our government; and that they belong to diplomacy and legislation, and not to the administration of the laws. And he (Curtis) justly observed, as a necessary consequence of these views, that, if the power to determine these matters is vested in congress, it is wholly immaterial to inquire whether by the act assailed it has departed from the treaty or not, or whether such departure was by accident or design, and, if the latter, whether the reasons were good or bad. In these

views we fully concur.'" Mr. Chief Justice Chase, in Ex parte McCardle, 7 Wall. 514, 19 L. Ed. 264, uses the following language: "We are not at liberty to inquire into the motives of the legislature. We can only examine into its power under the constitution, and the power to make exceptions to the jurisdiction of this court is given by express words." So, also, Chief Justice Marshall, in the case of Fletcher vs Peck, 6 Cranch, 130, 3 L. Ed. 162, in discussing this subject, says: "It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements operating on the members of the supreme sovereign power of a state to the formation of a contract by that power are examinable in a court of justice. If the principle be conceded that an act of the supreme power might be declared null by a court in consequence of the means which procured it, still there would be much difficulty in saying to what extent those means must be applied to produce this effect. * * * If a majority of the legislature be corrupted, it may well be doubted whether it be within the province of the judiciary to control their conduct; and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated is not clearly discerned."

The proposition of appellants that the act of congress and the Atoka agreement are both void because congress delegated its legislative power, in violation of sections 1, 7, art. 1, of the constitution of the United States, is not supported in its application to the legislation in question. Section 29 of said act provides: "That the agreement made by the commission to the Five Civilized Tribes with commissions representing the Choctaw and Chickasaw tribes of Indians, on the 23d day of April, 1897, as herein amended, is hereby ratified and confirmed and the same shall be of full force and effect if ratified before the 1st day of December, 1898, by a majority of the whole number of votes cast by the members of said tribes at an election held for that pur-

pose; and the executives of said tribes are hereby authorized and directed to make public proclamation that said agreement shall be voted on at the next general election, or at any special election, to be called by such executives for the purpose of voting on said agreement; and at the election held for such purpose all male members of each of said tribes qualified to vote under his tribal laws shall have the right to vote at the election precinct most convenient to his residence, whether the same be within the bound of his tribe or not: provided, that no person whose right to citizenship in either of said tribes or nations is now contested in original or appellate proceedings before any United States court, shall be permitted to vote at said election; provided, further, that the votes cast in both said tribes or nations shall be fortwith returned duly certified by the precinct officers to the national secretary of said tribes or nations, and shall be presented by said national secretaries to a board of commissioners consisting of the principle chief and a national secretary of the Choctaw Nation, the governor and national secretary of the Chickasaw Nation, and a member of the commission to the Five Civilized Tribes, to be designated by the chairman of said commission; and said board shall meet without delay at Atoka, in the Indian Territory, and canvass and count said votes and make proclamation of the result; and if said agreement as amended be so ratified, the provisions of this act shall then apply only to said tribes where the same do not conflict with the provisions of said agreement; but the provisions of said agreement, if so ratified, shall not in any manner, affect the provisions of section fourteen of this act." In Stephens vs Cherokee Nation, supra, Chief Justice Fuller, on page 466, 174, U. S. page 730, 19 Sup. Ct., and page 1041, 43 L. Ed., says: "Section 29 (of the Curtis Law) ratified the agreement made by the commission with the commissions representing the Choctaw and Chickasaw tribes, April 23, 1897, as amended by the act, and provided for its going into effect if ratified before December 1, 1898, by a majority of

the whole number of votes cast by the members of said tribes at an election held for that purpose." And on page 491, 174 U. S., page 739, 19 Sup. Ct., and page 1041, 43 L. Ed., he says: "The act (the Curtis Law) provided further for the resubmission of the two agreements, with certain specified modifications,— that with the Choctaws and Chickasaws and that with the Creeks, —for ratification, to a popular vote in the respective nations, and that, if ratified, the provisions of these agreements, so far as differing from the act, should supersede it. The Choctaw and Chickasaw agreement was accordingly so submitted for ratification August 24, 1898, and was ratified by a large majority, but whether or not the agreement with the Creeks was ratified does not appear. * * * The agreement with the Choctaw and Chickasaw tribes contained a provision continuing the tribal government, as modified, for the period of eight years from March 4, 1898, but provided that it should 'not be construed to be in any respect an abdication by congress of power at any time to make needful rules and regulations respecting said tribes.' For reasons already given, we regard this act, in general, as not obnoxious to constitutional objection, * * * " Mr. Sutherland, in his work on Constitutional Construction, uses this language: "If an act is adopted by the legislature as a law, and, pursuant to its provision, it is submitted to the people, and on their expression of approval or disapproval as a fact or event the act, by its terms, does or does not take effect, the only question is whether the legislature can pass a law to take effect on such a contingency. The authorities would seem now to have established the doctrine, though not universally, that the result of a popular vote is a contingency on which laws may be enacted to take effect." Mr. Cooley, in his work on Constitutional Limitation (6th Ed., p. 137), says: "A statute may be conditional and its taking effect may be made to depend upon some subsequent event." The remarks of Coulter, J., in Com. vs Painter, 10 Pa. 214, 216, are peculiarly applicable to this case, and are in

part as follows: "A strong illustration of the faculty of the legislative power in this respect may be found in the act of congress of the 9th of July, 1846, submitting the question of the retrocession of the county of Alexandria, in the District of Columbia, to the State of Virginia, to a vote of the qualified electors of that county. Virginia had previously enacted a law signifying her willingness to take back the county whenever the same should be receded by the congress of the United States. Congress enacted the law of the 9th of July, 1846, submitting the question to the qualified electors, and providing the machinery for the election, and enacting that, if a majority of the electors shall be against accepting the provisions of the act, it shall be void and of no effect, but, if a majority of votes shall be in favor of accepting, then it shall be in full force, and in that event it shall be the duty of the President to inform the Governor of Virginia of the result of the election, and that the law is consequently in force. Many of the most profound constitutional lawyers in the Union were in congress at that time, and the State of Virginia never hesitated to accept the retrocession because the congress of the United States delegated to the people the decision of the question." In the case of Bank of Rome vs Village of Rome, 18 N. Y. 38, it is held that an act of the legislature which by its terms is to take effect immediately, but which confers on certain municipal officers certain powers not to be exercised until the inhabitants of the municipality have approved the act by vote, is constitutional, and is not a delegation of legislative power. See, also, People vs Salomon, 51 Ill. 37, 52-55; Clarke vs Rogers, 81 Ky. 43; State vs Parker, 26 Vt. 357; State vs O'Neill, 24 Wis. 149. 'The event or change of circumstances on which a law may be made to take effect must be such as, in the judgment of the legislature, affects the question of the expediency of the law,—an event on which the expediency of the law in the opinion of the lawmakers depends. On this question of expediency the legislature must exercise its

own judgment definitely and finally. When a law is made to take effect upon the happening of such an event, the legislature, in effect, declares the law inexpedient if the event should not happen, but expedient if it should happen. They appeal to no other man or men to judge for them in relation to its present or future expediency. They exercise that power themselves, and then perform the duties which a constitution imposes upon them." Cooley, Const. Lim. 144.

We have thus very briefly referred to the elaborate arguments of appellants in support of their assignments of error, but, being of the opinion that the judgment of the court below was correct, it is therefore affirmed.