## ST. LOUIS-S. F. RY. CO. v. DAWSON. et al.

No. 16332—Opinion Filed June 1, 1926.

Rehearing Denied Sept. 14, 1926.

**1. Eminent Domain — Right of Way for Railroads Through Indian Land—Statutory Requirements.**

The provisions of the Act of Congress of April 25, 1896, with respect to the steps to be taken by a railroad company seeking to acquire additional right of way in lands belonging to an Indian nation or tribe are mandatory and not directory so far as said act requires the railroad company to deposit with the treasury of the tribe to which the lands belong compensation in cash at the rate of $25 per acre before taking possession of and using such lands.

**2. Same—Delay of Ten Years in Tendering Condemnation Money — Superior Rights of Vendee of Allottee.**

In such case, where the only steps taken in compliance with the provisions of the act, prior to allotment of the lands in severalty, was the filing of a plat with the Secretary of the Interior, showing the additional lands sought to be condemned, but after allotment of the lands in severalty, including the lands covered by said plat, and after the same had passed by deed from the original allottee to a purchaser without notice, a tender or payment of the condemnation money to the Secretary of the Interior more than ten years after the filing of the plat is ineffectual to confer any rights upon the railroad company as against the vendee of the allottee, such vendee having, at all times, been in actual possession and occupancy of the land, claiming title thereunder.

(Syllabus by Pinkham, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Ottawa County; J. J. Smith, Judge.

Action by St. Louis-San Francisco Railway Company against J. R. Dawson and

others. Judgment for defendants, and plaintiff brings error. Affirmed.

E. T. Miller, Stuart, Sharp & Cruce, and Ben Franklin, for plaintiff in error.

N. C. Barry and C. P. Fillebrown, for defendants in error.

Opinion by PINKHAM, C. This was an action in ejectment instituted by the plaintiff in error, St. Louis-San Francisco Railway Company, a corporation, as plaintiff, in the district court of Ottawa county, on June 24, 1922, against the defendants in error, J. R. Dawson, J. E. Branham, Charlie Pine, and Tom Pyeatt, as defendants, to secure possession of three certain parcels of land situated along the north side of, and immediately adjacent to, the original right of way of the plaintiff company near the town of Afton, in Ottawa county, the said tracts of land being fully described in the plaintiff's petition.

The plaintiff alleged in its petition that it is entitled to the immediate possession of said tracts of land, and that its title thereto was acquired pursuant to an Act of Congress approved on the 25th day of April, 1896 (29 Stat. L. 109), which said Act of Congress provided the manner by which the railway company could acquire real estate for railroad purposes from the Five Civilized Tribes of Indians; that the St. Louis & San Francisco Railroad Company, predecessor of the plaintiff, pursuant to said Act of Congress, did, on the 5th day of December, 1901, file with the Department of the Interior its certified map describing the above parcels of real estate for the purpose of acquiring title thereto; that said certified map was filed by the Secretary of the Interior among the records of his office, and that said St. Louis & San Francisco Railroad Company, predecessor of the plaintiff, deposited the sum of $468.75 in full payment for the said tracts of land, which sum was the amount agreed upon between the St. Louis & San Francisco Railroad Company and the Cherokee Nation, and that said sum was received by the Secretary of the Interior and deposited to the credit of the Cherokee Nation; that the Cherokee Nation accepted said sum as a full, complete, and satisfactory payment of all its right, title, and interest in and to the said tracts of land, and that said action upon the part of the St. Louis & San Francisco Railroad Company was ratified and approved by the Secretary of the Interior. A copy of said map showing approval of the Secretary is attached to plaintiff's petition.

The defendants, J. R. Dawson and J. E. Branham, by their answer, admit that they are in possession of the property described in plaintiff's petition and state that the defendants Pine and Pyeatt are their tenants, and that said Pine and Pyeatt have no interest in said land except as such tenants. They specifically deny that plaintiff is the owner of said tracts of land, or that it ever acquired the fee simple title to said property or any right, title or interest therein.

After issues had been regularly joined a trial was had before the court without the intervention of a jury, resulting in a judgment of the trial court in favor of the defendants. Motion for new trial was overruled, exception reserved, and plaintiff has duly appealed to this court by petition in error and case-made attached.

The plaintiff claims that it acquired title to the land in question under the Act of Congress of April 25, 1896 (29 Stat. L. 109), and all of its assignments of error are directed mainly to the one proposition, that in view of the undisputed facts disclosed on the trial the court erred in rendering judgment against the plaintiff and in favor of the defendants.

It appears that prior to August, 1901, the Kansas City, Ft. Scott & Memphis Railway Company had commenced the construction of a line of railway from Miami, Okla., to Afton, Okla., and said railway being desirous of obtaining lands for its right of way, procured on the 10th day of April, 1901, from the defendant James R. Dawson, and from one Wig Dawson and Alice Dawson, a release of their occupant rights of the land in controversy. It also appears that on the 13th day of March, 1901, and on the 4th day of April, 1901, said Kansas City, Ft. Scott & Memphis Railway Company obtained from the defendant James R. Dawson and his brother, Wig Dawson, and other citizens of Afton, a guaranty that no charges would be made for occupant rights to the land in question. On the 23rd day of August, 1901, the Kansas City, Ft. Scott & Memphis Railway Company leased for a period of 99 years its property, including the land in controversy in this case, to the St. Louis & San Francisco Railroad Company. On June 27, 1901, the St. Louis & San Francisco Railroad Company commenced proceedings under said Act of Congress of April 25, 1896, to obtain an easement upon the identical land in regard to which the Kansas City, Ft. Scott & Memphis Railway Company had obtained a release from the defendant J. R. Dawson and others, as before stated. The St. Louis & San Francisco Railroad Com-

pany filed with the Secretary of the Interior on June 27, 1901, its petition under said Act of Congress, and filed with the Secretary of the Interior its map of said land to be condemned.

On the 5th day of December, 1901, as a result of the report of the Commissioner of Indian Affairs, the Secretary of the Interior approved the railroad company's application for the acquirement of said lands, and indorsed his approval on the map filed with him by said railroad company. The evidence shows that after the approval of the map of definite location by the Secretary of the Interior on December 5, 1901, no attempt was made by the railroad company to come to an agreement with the Cherokee Nation in regard to the amount of compensation to be paid for the land until some ten years thereafter, when, in December, 1911, the company forwarded a draft to the Secretary of the Interior for $468.75 as payment for the two parcels of land shown on said map, "parcel No. 1" including the lands involved in this controversy. This remittance was received by the Secretary of the Interior December 21, 1911, and by him referred to the Commissioner of Indian Affairs December 22, 1911, and sometime later the matter was referred to the Principal Chief of the Cherokee Nation, and on February 29, 1912, the national attorney for the Cherokee Nation notified the Commissioner to the Five Civilized Tribes that "The Cherokee Nation has no objection to receiving money amounting to $468.75 and the same will be placed to the credit of the Cherokee Nation."

It further appears that long before this remittance was made in December, 1911, and some five years after the approval of the map of definite location, the Cherokee Nation had conveyed a part of this land by allotment deed or patent to John Muskrat, and on October 31, 1907, nearly six years after the approval of said map, the Cherokee Nation conveyed another portion of this land by allotment deed or patent to Ancil F. Dawson, and on November 13, 1908, nearly seven years after the approval of said map, the Cherokee Nation conveyed still another portion of said lands by allotment deed or patent to Bertrand D. Branham.

The St. Louis & San Francisco Railroad Company, predecessor of the plaintiff, had due and legal notice of these transactions (section 39, Act Congress March 1, 1901, 31 Stat. L. 848), and permitted the lands to be allotted without objection on its part. An examination of these deeds, copies of which are incorporated in the record, shows that the Cherokee Nation conveyed these lands to the several allottees without excepting therefrom the land now claimed by the plaintiff company, and it further appears that the Secretary of the Interior approved all of these allotment deeds or patents. It further appears that in each of these allotment deeds or patents the original right of way of the St. Louis & San Francisco Railroad Company is specifically excepted from the grant, from which we think it may be fairly inferred that neither the Cherokee Nation, the Dawes Commission, nor the Secretary of the Interior, considered the negotiations begun in 1901 by the railroad company to acquire these lands as still pending.

The allottees of this land, John Muskrat, Ancil F. Dawson, and Bertrand D. Branham, accepted the allotment deeds and the conveyance of their respective portions of this land as part consideration for the relinquishment of all their rights, title, and interest in the remaining lands of the Cherokee Nation (section 37, Act Congress, March 1, 1901, 31 Stat. L. 848), and when the allotment deeds were received in the office of the Commissioner to the Five Civilized Tribes, the legal title to the lands, together with the right of possession thereof, passed to the respective allottees (section 5, Act Congress, April 26, 1906, 34 Stat. L. 137), absolutely and in fee simple, and they entered into possession of the same, and they and their grantees and lessees have continuously occupied and used the land ever since.

It appears to be the theory of the plaintiff company, as we understand it, that when it procured its lease from the Kansas City, Ft. Scott & Memphis Railway Company on the 4th day of April, 1901, it stepped into the shoes of that company and completed the proceedings to condemn this land which had been commenced by the Kansas City, Ft. Scott & Memphis Railway Company. So far as this proposition is concerned, we think it sufficient to say that the release obtained from the occupants of the land involved by the Kansas City, Ft. Scott & Memphis Railway Company in 1901, and the guaranty instrument executed by certain citizens of Afton at the same time, show upon their face that the Kansas City, Ft. Scott & Memphis Railway Company did not proceed under the Act of Congress in question, but was merely attempting to obtain a right of way in contemplation of the construction of a line of railway.

The plaintiff contends further that the approval of the map of definite location by

the Secretary of the Interior amounted to the institution of proceedings to condemn this property for railroad purposes. The approval of the map amounts only to permission to acquire the land, either by amicable settlement with the tribe or occupants or by condemnation proceedings. The Act specifically provides that in case condemnation proceedings are instituted and either party appeals from the award of the referees, "the case, both as to the necessity for the taking as well as the amount of damages, shall be tried de novo." Thus it appears that even after the approval of the map of definite location, the right of a railroad company to take and use the land could be defeated by failure to agree as to the amount of compensation by an appeal from the award of the referees and an adjudication by the court that the taking of such lands was not necessary.

The Act of Congress under which the plaintiff company claims to have acquired this land provides:

"* * * But before taking possession of and using such lands the railroad company shall deposit with the treasury of the tribe to which the lands belong compensation in cash at the rate of $25 per acre."

—and, further, in case of disagreement and appeal to the United States Court from the award of the referee appointed by the Secretary of the Interior, that:

"When proceedings have been commenced in court, and the court has determined the necessity for such taking, the railroad company shall pay double the amount of the award into court to abide the judgment thereof, and then to have the right to enter upon the property sought to be condemned and proceed with the construction of such depot with the necessary tracks."

The plaintiff company contends that there is nothing in said Act which takes away from the railway company and the tribe of Indians the right to settle said matter between themselves on an amicable basis in any manner they see fit. It is true that the railroad company and the Cherokee Nation had the right to agree amicably between themselves on the compensation to be paid for this land at the rate of $25 per acre, or some greater sum, but we think it clearly appears that there was no amicable agreement between the railroad company and the Cherokee Nation as to the amount of compensation to be paid.

The plaintiff company further contends that there is nothing in the Act of Congress in question which prevents the rail-

way company and the Indian Tribe from agreeing that the railway company take possession of the condemned land at once, and that an agreement as to the amount to be paid to said Tribe of Indians may be reached at a future date. The contention cannot be sustained. The Act specifically provides that the railroad company shall not take possession or use the land until it has deposited with the treasury of the tribe compensation in cash at the rate of $25 per acre, or in case of condemnation proceedings until after the court has determined that the taking is necessary and the company has paid into court double the amount of the award of the referees appointed by the Secretary of the Interior.

Counsel for plaintiff company concede in their brief that as a general rule land cannot be condemned unless compensation is first paid to the individual landowner, but it is contended that there is an exception as well established as the rule itself; that the individual landowner may waive the right to insist upon payment prior to entry; and the conclusion is drawn that in this case the Cherokee Nation waived its right to insist upon payment of the condemnation money prior to entry. Numerous cases are cited in support of this proposition. These cases are not applicable to the instant case for the reasons: First, that no proceedings to condemn the lands in controversy were ever had or commenced as provided in the Act of Congress relied upon; and second, because at the time the railroad company sought to acquire these lands the Cherokee Nation was a domestic and dependent nation (Thebo v. Choctaw Tribe, 66 Fed. 372, 13 C. C. A. 519), dependent upon the United States government and wards of the nation (Tuttle v. Moore, 3 Ind. T. 712, 64 S. W. 585; Ansley v. Ainsworth, 4 Ind. T. 308, 69 S. W. 884), and could dispose of its public domain only in the manner authorized by Congress.

In the cases cited it appears that the landowners were competent to deal as they saw fit with their property, and therefore could waive the right to compensation prior to entry. The Cherokee Nation could not waive the specific requirement of Congress that the compensation should be paid into the tribal treasury, or in case of condemnation proceedings into court by the railroad company before it occupied or used the property.

The circumstance upon which council for plaintiff company base their proposition that the Cherokee Nation waived its right to insist upon payment of the condemnation money prior to entry, is that prior to the approval of said map, on or about Oc-

tober 31, 1901, at an investigation held by the United States Indian Agent to investigate the necessity of the establishment of additional station grounds, the Principal Chief of the Cherokee Nation was present and did not contest the necessity for the acquiring of such land by the railroad company, but reserved the right to fix the price to be paid to the Cherokee Nation for this land at some future time, said price to be either fixed by himself or by the National Council of the Cherokee Nation.

We do not think this statement made by the Principal Chief of the Cherokee Nation can be construed into an agreement on the part of that nation, that the taking of such land was necessary and constituted a waiver of the requirement of the Act in question, that compensation in the amount of $25 per acre should be deposited in the treasury of the tribe, and was a consent of the Cherokee Nation to the taking possession of said land without first paying for the same.

There is no evidence that the matter was ever taken up with the nation, or that any officer of the nation other than the Principal Chief ever knew anything about the attempt to acquire this land by the railroad company until long after the Cherokee Nation had disposed of it.

The Cherokee Nation had an organized government with a Constitution providing for executive, legislative, and judicial departments. It was "a domestic and independent state subject to the jurisdiction and authority of the United States," and there was nothing in its Constitution and laws authorizing its Principal Chief to agree to the disposition of any part of the public domain of the nation.

We have not overlooked the case of Great Northern Railway Co. v. Vivian H. Steinke et al., 261 U. S. 119, 67 L. Ed. 564, cited by counsel for plaintiff company. The case cited construed the Act of March 3, 1875, c. 152, 18 Stat. L. 482. The act under consideration in the case cited had relation to the obtaining of title to public lands of the United States by railway companies. This case and others of similar import cited in the brief of the plaintiff are not, we think, applicable to the instant case, which is governed by the Act of Congress of April 25, 1896.

Upon an examination of the entire record, we think the judgment of the trial court should be affirmed.

By the Court: It is so ordered.

Note.—See under (1) 31 C. J. p. 504 § 54 (Anno). (2) 31 C. J. p. 504 § 54 (Anno).